JANETTE K. BRIMMER
(WSB #41271)
STEPHANIE K. TSOSIE
(WSB #49840)
(*Admitted Pro Hac Vice*)
Earthjustice
705 Second Avenue, Suite 203
Seattle, WA  98104-1711
(206) 343-7340 | Phone
(206) 343-1526 | Fax
jbrimmer@earthjustice.org
stsosie@earthjustice.org
*Attorneys for Plaintiff Upper Missouri
Waterkeeper*

KATHERINE O'BRIEN
(MSB #13587)
Earthjustice
313 East Main Street
Bozeman, MT  59715-6242
(406) 586-9699 | Phone
(406) 586-9695 | Fax
kobrien@earthjustice.org
*Local Counsel for Plaintiff Upper
Missouri Waterkeeper*

## UNITED STATES DISTRICT COURT
## DISTRICT OF MONTANA, GREAT FALLS DIVISION

| | |
|---|---|
| UPPER MISSOURI WATERKEEPER, | ) No.  4:16-cv-00052-BMM |
| | ) |
| Plaintiff, | ) MEMORANDUM IN |
| v. | ) SUPPORT OF SECOND |
| | ) MOTION FOR SUMMARY |
| UNITED STATES ENVIRONMENTAL | ) JUDGMENT |
| PROTECTION AGENCY and SCOTT PRUITT, | ) |
| Administrator, United States Environmental | ) |
| Protection Agency, | ) |
| | ) |
| Defendants, | ) |
| and | ) |
| | ) |
| STATE OF MONTANA DEPARTMENT | ) |
| OF ENVIRONMENTAL QUALITY, TREASURE | ) |
| STATE RESOURCES ASSOCIATION OF | ) |
| MONTANA, MONTANA LEAGUE OF CITIES | ) |
| AND TOWNS, and NATIONAL ASSOCIATION | ) |
| OF CLEAN WATER AGENCIES, | ) |
| | ) |
| Intervenor-Defendants. | ) |

TABLE OF CONTENTS

INTRODUCTION .................................................................................1

LEGAL FRAMEWORK AND FACTUAL BACKGROUND ..................................2

I.   WATER QUALITY STANDARDS FRAMEWORK ..................................2

II.  NUTRIENT POLLUTANTS. ........................................................... 3

III. MONTANA NUTRIENT WATER QUALITY STANDARDS
     DEVELOPMENT AND AMENDMENT. ....................................4

     A.  DEQ Circulars 12-A and 12-B. ...........................................4

     B.  The Development of Circular 12-B. ....................................6

     C.  EPA Approval. ................................................................9

     D.  Amended Circular 12-B. ................................................ 10

JURISDICTION ...............................................................................13

STANDARD OF REVIEW ................................................................. 13

ARGUMENT .................................................................................. 14

I.   THE WATER QUALITY STANDARDS APPROVED BY EPA
     FAIL TO CONFORM TO THE REQUIREMENTS OF THE CLEAN
     WATER ACT .............................................................................14

     A.  The Clean Water Act Requires Water Quality Standards To
         Include Science-Based Criteria Necessary To Protect
         Designated Uses Of Montana's Waters. ........................... 15

     B.  EPA's Approval of Amended Circular 12-B, A Water Quality
         Standard for Nutrient Pollution Based On What Is Considered
         Affordable Pollution Control, Violates The Plain Language Of
         The Clean Water Act ......................................................17

     C.  EPA Cannot Subvert The Requirements Of The Clean Water
         Act Through Application Of A Rule .................................24

II.     EPA CANNOT DOWNGRADE DESIGNATED USES IN ORDER
        TO WEAKEN WATER QUALITY STANDARDS FOR COST
        REASONS. ................................................................................................ 26

CONCLUSION ..................................................................................................30

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)..................................................................14

*Chevron USA, Inc. v. Natural Res. Def. Council, Inc.*,
   467 U.S. 837 (1984)..............................................................13, 16

*Christopher v. SmithKline Beecham Corp.*,
   567 U.S. 142 (2012)..................................................................13

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
   698 F.3d 1101 (9th Cir. 2012) ...................................................14

*Forest Serv. Emp's for Envtl Ethics v. U.S. Forest Service*,
   726 F.Supp.2d 1195 (D. Mont. 2010)........................................14

*Husted v. A. Philip Randolph Inst.*,
   2018 WL 2767661 (Sup. Ct., June 11, 2018) ............................17

*Idaho Mining Ass'n, Inc. v. Browner*,
   90 F. Supp. 2d 1078 (D. Idaho 2000) ........................................28

*Miccosukee Tribe of Indians of Florida v. United States*,
   706 F. Supp. 2d 1296 (S.D. Fla. 2010)................................21, 23

*Miccosukee Tribe of Indians of Florida v. United States*,
   No. 04-21448-CIV, 2008 WL 2967654 (S.D. Fla. July 29, 2008)...21, 22, 23, 25

*Miss. Comm'n on Natural Res. v. Costle*,
   625 F.2d 1269 (5th Cir. 1980) .................................................2, 17

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983)..............................................................13, 14

*Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*,
   477 F.3d 668 (9th Cir. 2007) .....................................................14

*Occidental Eng'g Co. v. I.N.S.*,
   753 F.2d 766 (9th Cir. 1985) .....................................................14

*Pac. Coast Fed'n of Fishermen's Ass'ns, Inc. v. Nat'l Marine
    Fisheries Serv.,*
    265 F.3d 1028 (9th Cir. 2001) ................................................................13

*Pac. Rivers Council v. Thomas,*
    30 F.3d 1050 (9th Cir. 1994) ..................................................................17

*Tenn. Valley Auth. v. Hill,*
    437 U.S. 153 (1978).................................................................................16

*United States v. Doe,*
    701 F.2d 819 (9th Cir. 1983) ..................................................................25

*United States v. Maes,*
    546 F.3d 1066 (9th Cir. 2008) ...........................................................17, 25

*Valencia v. Lynch,*
    811 F.3d 1211 (9th Cir. 2016) ................................................................17

*Waterkeeper Alliance, Inc. v. U.S. EPA,*
    399 F.3d 486 (2d Cir. 2005) ..............................................................13, 14

*Whitman v. American Trucking Ass'ns,*
    531 U.S. 457 (2001).................................................................................17

**Statutes**

5 U.S.C. § 706(2)(A).......................................................................................13

33 U.S.C. § 1251(a) ....................................................................................1, 15

33 U.S.C. §§ 1311(b)(1)(c) .............................................................................3

33 U.S.C. § 1313 ...................................................................................*passim*

33 U.S.C. § 1313(c)(2)(A) ....................................................................2, 16, 27

33 U.S.C. § 1313(c)(4).....................................................................................3

33 U.S.C. § 1342 (a)(1) ...................................................................................3

Mont. Code Ann. § 75-5-103(2) .....................................................................4

Mont. Code Ann. §75-5-313 ......................................................................6, 20

## Regulations

40 C.F.R. § 122.44(d) ...................................................................................3

40 C.F.R. § 131.2 .........................................................................................2

40 C.F.R. § 131.10(g) .................................................................................24

40 C.F.R. § 131.11(a)(1) ...............................................................................2

40 C.F.R. § 131.14 ......................................................................................25

## Other Sources

65 Fed. Reg. 47167 (July 27, 2000)....................................................3, 19

INTRODUCTION

Congress enacted the Clean Water Act with the promise and goal to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a)(1), including by eliminating all discharges of pollution to waters by 1985. 33 U.S.C. § 1251(a)(2). The development of water quality standards to protect all waters for humans, fish, and wildlife is a primary and foundational requirement of the Clean Water Act for meeting those promises, goals, and obligations. 33 U.S.C. § 1313.

The Montana Department of Environmental Quality ("DEQ") adopted, and the Environmental Protection Agency ("EPA") approved with record support, water quality standards for nutrient pollutants that include science-based numeric criteria that will protect designated uses in Montana's waters such as public health, fishing, and recreation. But EPA simultaneously rendered those science-based standards meaningless by approving DEQ's weaker replacement "variance" standard based on affordability of waste treatment technology, and not on the quality of water actually needed to support the designated uses of Montana's waters. And while EPA has since approved an amended version of the weaker "variance" standard, it is still cost-based, it still replaces the protective science-based water quality standard, and it provides no deadline or plan for compliance with the numeric criteria designed to actually protect designated uses of Montana's

waters.

The substitute technology-based standard (the variance), is contrary to Clean Water Act requirements for water quality standards and contrary to the entirety of the record.  Waterkeeper respectfully requests that the Court reverse and vacate EPA's approval of DEQ's Amended Circular 12-B.

LEGAL FRAMEWORK AND FACTUAL BACKGROUND

I.    WATER QUALITY STANDARDS FRAMEWORK

Congress mandated that states establish water quality standards that "consist of the designated uses of the navigable waters involved and the water quality criteria for such waters based upon such uses."  33 U.S.C. § 1313(c)(2)(A); 40 C.F.R. § 131.2.  EPA regulations specify that "[s]uch criteria must be based on sound scientific rationale and must contain sufficient parameters or constituents to protect the designated use."  40 C.F.R. § 131.11(a)(1).  Because water quality criteria must be set at a level that protects the designated use, economic factors "are irrelevant" and states should not take them into account when setting criteria to protect uses.  *Miss. Comm'n on Natural Res. v. Costle,* 625 F.2d 1269, 1277 (5th Cir. 1980).

While Congress directed states to develop standards, Congress also directed EPA to act in a "backstop" capacity where states submit proposed standards to EPA for review and approval or disapproval.  33 U.S.C. § 1313(c)(2)(A).  EPA's

authority to approve state standards is cabined by the requirements for water quality standards to protect designated uses and to serve the purposes of the Clean Water Act. *Id*. §§ 1313(c)(2)(A),1313(c)(2)(3). A state's standards take effect upon EPA's approval. If EPA disapproves and a state is unable or unwilling to correct them, EPA is obligated to step in and develop standards that protect designated uses and meet the requirements of the Act. 33 U.S.C. § 1313(c)(4). Adopting science-based and protective water quality standards is foundational to proper implementation of the Clean Water Act.[1]

## II.   NUTRIENT POLLUTANTS.

EPA and the states have long understood that nitrogen and phosphorus pollutants ("nutrients") in lakes, rivers, and streams cause serious water quality problems. Accordingly, in 2000 EPA first directed states to adopt water quality standards to address nutrients. EPA, *Nutrient Criteria Development; Notice of Nutrient Criteria Technical Guidance Manual: Rivers and Streams*, 65 Fed. Reg. 46167 (July 27, 2000). *See also,* Administrative Record 228 *et seq*.[2] Despite the direction in 2000, many states, like Montana, have only recently complied.

---

[1] Congress prohibited all pollutant discharges to water absent a permit, and water quality standards are a primary driver of those permit requirements. 33 U.S.C. §§ 1311(b)(1)(c) and 1342 (a)(1). *See also,* 40 C.F.R. § 122.44(d).

[2] Citations to the Administrative Record are "AR" throughout with the pagination provided in EPA's Index to the Administrative Record, filed December 1, 2016, supplemented April 30, 2018, ECF Dkt. No. 146.

Nutrient pollution feeds algal blooms that choke waterways, depletes oxygen for fish and aquatic organisms, and changes the balance of ecosystems.  AR 241-249. *See also* AR 11685, AR 1349.  At its worst, nutrient pollution can result in toxic or hazardous algal blooms, which can sicken humans and animals.  AR 241-249.

EPA's nutrient criteria guidance provides a structure for states to develop science-based numeric criteria designed to protect lakes and rivers from the harmful effects of nutrient pollution, consistent with requirements of the Clean Water Act. AR 228 *et seq*.  This structure respects the two components of a water quality standard: the designated uses that are to be protected in the water, and the quality criteria for the target pollutant necessary to ensure those uses are protected.

III.   MONTANA NUTRIENT WATER QUALITY STANDARDS DEVELOPMENT AND AMENDMENT.

A.   DEQ Circulars 12-A and 12-B.

In July 2014, DEQ simultaneously published two sets of water quality standards for nutrients, contained in DEQ Circulars 12-A and 12-B.  AR 1218 and 1229, respectively.  Based upon a large body of scientific work, including the extensive work and direction from EPA's nutrient guidance, Circular 12-A sets numeric criteria for phosphorus and nitrogen as specified in Mont. Code Ann. § 75-5-103(2), to protect all designated uses such as health, fishing, and recreation, in most waters of Western Montana.  AR 1220-1225 (12-A), 1326, 1346, and 1636.  Circular 12-A's numeric nutrient standards specify pollutant concentration

limits, as well as the geographical areas and the seasonal timeframes to which the standards apply.  AR 1220-25.  The limits on phosphorus and nitrogen pollutants are tied to Montana's particular ecoregional characteristics, and the resulting water quality criteria call for total in-stream phosphorus concentrations ranging from 25 micrograms per liter ("µg/L") to 150 µg/L and total nitrogen concentrations ranging from 250 µg/L to 1300 µg/L.  AR 1222.[3]

Circular 12-B, developed and issued in conjunction with Circular 12-A, effectively replaced the science-based in-water numeric standards in Circular12-A with a much less stringent technology-based performance standard.  DEQ identifies the technology-based performance standard in Circular 12-B as a "variance," which both EPA and DEQ acknowledged would not be stringent enough to protect all designated uses.  AR 1229 and 849-50.  Rather, Circular 12-B was based exclusively on the cost of pollutant removal technology that DEQ and a group of pollutant dischargers decided was affordable for all dischargers of nutrient pollutants.  AR 1230, 1231 and 851.  The Circular 12-B technology-based standard (or variance) was the subject of the original Complaint and Motions for Summary Judgment in this case, wherein Waterkeeper argued that Circular 12-B

---

[3] Ecoregions are described in EPA's nutrient guidance, AR 228 *et seq.*, and refer to regions of the United States having particular geologic, soil, topographic and/or other natural characteristics that may in turn affect natural water quality and ecosystem characteristics.  AR 259.

effectively supplanted the science-based numeric criteria in 12-A.  *See, e.g.,* AR

1231-32.[4]  The Circular 12-B "variance" was not expressed in terms of the desired

in-stream conditions, but instead as an allowable pollutant concentration applicable

to the effluent discharged from the end of the pipe, achievable by technological

performance of treatment systems.  AR 1232.

     The cost-driven "variance" in Circular 12-B supplanted the Circular 12-A

science-based criteria for a period of 20 years.  AR 1231.  While reviewed every

three years, as required by 33 U.S.C. § 1313(c), Circular 12-B specified that in the

triennial review DEQ must consider "the aggregate economic impact to

dischargers within a category."  AR 1232.  Specifically, DEQ was permitted but

not required to adopt more protective standards "[i]f a low-cost technological

innovation for lowering nitrogen and phosphorus concentrations in effluent were to

become widely available in the near future[.]"  *Id*.

     B.    <u>The Development of Circular 12-B</u>.

     Early in the process of developing water quality standards, DEQ established

---

[4] Circular 12-B stated:

> [A] person who meets the end-of-the-pipe treatment requirements
> provided for in Table 12B-1 may apply for and the Department shall
> approve a general nutrients standards variance ("general variance").
> Mont. Code Ann. §75-5-313(5)(b).

AR 1231.  That was the total extent of requirements for obtaining the "variance."

a nutrient workgroup with certain stakeholders.  This workgroup was heavily

involved in shaping DEQ's work.  *See, e.g.*, AR 5801-04 and AR 11606.  The

record demonstrates that cost and economic considerations were a central part of

promulgating the state water quality standards from the outset.  *See, e.g.,* "Ongoing

Discussion of Affordability Assessment Procedure to Accompany Base Numeric

Nutrient Standards" (Oct. 2008), AR 11 and AR 5801-04 (DEQ memorandum

regarding "nutrient criteria affordability advisory group, dated September 4,

2008).[5]  The first meeting in May 2009 explored "variances" as a means to "*off-

ramp from the standards* based on affordability."  AR 11606 (emphasis added).  In

response to a workgroup question, DEQ indicated that it would even consider

downgrading designated uses to allow for *even higher* levels of pollutants if, after

time, compliance with the standards would not be "practical due to affordability or

technology[.]" AR 11610.

Communications between DEQ and EPA indicate that cost considerations

drove analysis throughout the process.  *See, e.g.,* Letter from DEQ to EPA, Feb.

---

[5] In fact, cost considerations were on DEQ's agenda as early as 2007.  A DEQ
report from that year evaluated "[t]he potential economic impacts of the
preliminary nutrient criteria on public and private waste water treatment entities."
AR 5165.  The report examined wastewater treatment plant performance data, and
contrary to later concerns and ultimate outcomes in the standards, found "that
advance phosphorus treatment is affordable."  The report's case studies
demonstrated that even smaller communities may be able to afford advanced
nutrient removal.  AR 5172-73, 5182.

16, 2010, where DEQ suggests that, absent a particular affordability allowance from EPA, "adoption of numeric nutrient criteria for Montana could be in jeopardy."  AR 11829.  EPA and DEQ strove to find that protective water quality standards were "too costly" even though, by September of 2013, it appears that DEQ had determined a majority of towns could afford to meet protective numeric criteria.  AR 17026-27.  A January 21, 2010 DEQ presentation further emphasizes that DEQ was not engaged in an exercise to simply set water quality standards to protect uses under the Clean Water Act, but rather was engaged in a side-by-side cost-benefit analysis of whether to adopt protective standards, weighing and discussing the "worth" of clean water and how a dollar figure could be attached to that "value" and how the "costs" of standards outweighed those hard-to-identify environmental "benefits."  AR 6680-6696.  The economic evaluation and justifications for a technology-based performance standard in Circular 12-B, instead of numeric criteria designed to protect in-water quality for designated uses, culminated in the development of a Substantial and Widespread Economic Impacts Analysis report where DEQ based its conclusions mainly on a sampling of dischargers, rather than actual financial data from all dischargers.  AR 9109. The Report reflected DEQ's decision that the science-based numeric nutrient criteria that would protect designated uses would be too costly for the *entire state*.  *Id.*

The record also makes clear that the Circular 12-B "variance" technological

standard had to be the applicable standard or the Circular 12-A numeric nutrient

water quality standards; if EPA did not approve the Circular 12-B "variance," then

the protective Circular 12-A nutrient standard would also be terminated.  *See e.g.,*

AR 11606 and 11829.  In fact, DEQ provided a poison pill in rules directing that if

EPA did not approve the technological performance standard as a general and

state-wide "variance" or if a court declared it invalid, then the science-based

numeric criteria would automatically be "void."  ARM § 17.30.619.  DEQ

submitted Circulars 12-A and 12-B together for EPA approval on August 15, 2014.

AR 2362.

      C.    <u>EPA Approval.</u>

     Despite a statement that approval of a statewide all-discharger general

variance "will likely be a difficult Clean Water Act consistency issue," AR 9852,

EPA approved both the Circular 12-A numeric nutrient standards *and* 12-B

technology-based "variance" standard in February 2015.  AR 826.  EPA approved

Circular 12-A on the basis that the provisions "are based on a sound scientific

rationale that is consistent with the EPA guidance on deriving [numeric nutrient

criteria] using scientifically defensible methods."  AR 837.  EPA simultaneously

approved the Circular 12-B "variance" standard that effectively replaced the

science-based numeric standard for 20 years, claiming that applying the actual

numeric nutrient criteria to protect water quality would result in "substantial and

widespread economic and social impacts for all [publicly owned treatment works] covered by a general variance." AR 850.

    D.    <u>Amended Circular 12-B.</u>

After Waterkeeper filed its suit in May 2016, DEQ embarked on a process to amend Circular 12-B. On June 24, 2017, several days before the oral argument on Motions for Summary Judgment, DEQ finalized Amended Circular12-B and submitted it to EPA for approval. AR 20647. *See also,* ECF Dkt. No. 98. EPA approved, in relevant part, Amended Circular 12-B on October 31, 2017. AR 20376 *et seq.*

While Amended Circular 12-B imposed a more stringent technology-based standard for mechanical dischargers[6] than in original Circular 12-B, Amended Circular 12-B is still based on cost and still does not protect designated uses contrary to the requirements of 33 U.S.C. § 1313(c). Specifically:

        a.    Amended Circular 12-B is still based on cost, as opposed to the science-based standard that is necessary to protect designated uses of Montana waterways, AR 20648-51, AR 20380-86, and generally as set forth in detail below;

        b.    Amended Circular 12-B continues a cost-based technology standard or "variance" that supplants the science-based nutrient criteria promulgated in Circular 12-A, as it will still apply to multiple pollutant dischargers and across multiple waterbodies, AR 20649;

---

[6] Mechanical waste treatment plants are non-lagoon systems that use some kind of active waste treatment.

c.  The Amended Circular 12-B cost-based technology standard applies to 36 municipal pollutant dischargers across the state, including 9 mechanical plant systems and 27 lagoon systems, AR 20648-50; AR 20380-81, 83-84, and AR 20409-11;

d.  The cost-based technology standard for 9 mechanical plants has changed from the original Circular 12-B, with Amended Circular 12-B imposing more stringent nutrient limits than the original; however, the agencies acknowledge that Amended Circular 12-B technology standard is still less stringent than what is needed to protect designated uses, AR 20648-50 and AR 20380-81 and *see* AR 849-50;

e.  For lagoon systems, the results are largely unchanged from original Circular 12-B. Amended Circular 12-B, which requires (a) no reductions in pollution effluent limits for lagoons ("maintaining the current long-term average concentration"), (b) requires DEQ to study potential "novel" methods of addressing pollution from lagoons, and (c) requires DEQ to ensure lagoons conduct operational pollutant minimization efforts, but only if those minimization efforts "do not require substantial investment or additional study," AR 20410-13;

f.  The cost-based technology standard in Amended Circular 12-B is ultimately less stringent than the original Circular12-B, because, as reflected in DEQ's own record documents, Amended Circular 12-B now only requires a pollutant discharger to meet the variance standard at the end of the 17-year timeline  with no deadline or plan for meeting the actual science-based standard set forth in Circular 12-A (as opposed to the Original Circular 12-B, which contemplated that dischargers would continually move toward meeting the Circular 12-A criteria at some point near the end of the 20 year term of the variance) (*See* AR 37321 graph showing brown dashed line representing the Amended Circular 12-B cost-based technology standard stopping well short of achieving the Circular 12-A standard that will protect designated uses of Montana waters, as compared to the black line which represents original Circular 12-B);[7]

---

[7] AR 37331 shows a similar representation of Amended Circular 12-B variance never achieving the actual protective standard.  It should further be noted that Amended Circular 12-B incorporates a "coefficient of variation" allowing pollutant dischargers additional latitude in where they fall along the dashed Amended

g.  The original Circular 12-B provided that the cost-based technology standard would last "up to 20 years," for all dischargers to which it applied, with potential for renewal. AR 1231 and 1233.  DEQ's assertion in Amended Circular12-B now provides mechanical plants up to 17 years just to achieve the weaker cost-based technology standard. AR 20649 and 20651-52;

h.  EPA's partial approval of Amended Circular 12-B approves the 17-year schedule for mechanical plant changes, AR 20413-14, and provides that the technology standard approval for both mechanical plants and lagoons lasts for 17 years from the date of EPA approval, *id.*, and the EPA approval is silent on what EPA expects or requires beyond 17 years, including whether the actual numeric criteria need be met at any point after the 17-year schedule; and

i.  As with the original Circular 12-B, Amended Circular 12-B provides that it will be reviewed every three years and, as with original Circular 12-B, the three-year evaluation requires DEQ to simply consider whether new low-cost treatment technology has become available; the determination of whether low-cost treatment technology exists and must be imposed is solely based on the "aggregate economic impact" to a category of pollutant dischargers across the state.  AR 20650-51; AR 20417.[8]

Amended Circular 12-B is an entirely cost-driven standard that continues to

violate Clean Water Act requirements.

---

Circular 12-B compliance line and how close they will come to meeting the variance standard.  AR 20649 and 37329.

[8] EPA disapproved DEQ's extension of the cost-based technology standard to private industry pollutant dischargers in Amended Circular 12-B because DEQ did not obtain financial information to make a cost-based hardship decision.  EPA's decision leaves open the ability for DEQ to make a cost-based hardship decision for private industry future EPA approval.  AR 20384.

JURISDICTION

Waterkeeper adopts and incorporates by reference the Jurisdiction section of

its original Memorandum in Support of Motion for Summary Judgment filed

December 16, 2016, ECF Dkt. No. 68, and relies on the Standing Declarations

filed in support of its Motion at that time, ECF Dkt. Nos. 69-71.

STANDARD OF REVIEW

Under the Administrative Procedure Act, the court will set aside agency

action that was "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law."  5 U.S.C. § 706(2)(A).  An agency acts contrary to the law

when it fails to abide by and implement the direction and intent of Congress.

*Chevron USA, Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43

(1984); *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012).

"[A]n agency rule [is] arbitrary and capricious if the agency has relied on factors

which Congress has not intended it to consider, entirely failed to consider an

important aspect of the problem, offered an explanation for its decision that runs

counter to the evidence before the agency, or is so implausible that it could not be

ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle*

*Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Pac. Coast*

*Fed'n of Fishermen's Ass'ns, Inc. v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028,

1034 (9th Cir. 2001).  *See also*, *Waterkeeper Alliance, Inc. v. U.S. EPA,* 399 F.3d

486, 498 (2d Cir. 2005).

The agency must explain how it has reached its conclusions, making a rational connection between the facts found and the choice made. *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1124 (9th Cir. 2012); *Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 687 (9th Cir. 2007). It is not appropriate for a court to defer to EPA on a matter that the agency has failed to address or explain. *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43, 50; *Waterkeeper Alliance,* 399 F.3d at 498.

## ARGUMENT

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Because this case involves review of final agency action and an administrative record, it does not present any genuine issues of material fact and resolution of the case on summary judgment is appropriate. *Forest Serv. Emp's for Envtl Ethics v. U.S. Forest Service*, 726 F.Supp.2d 1195, 1207 (D. Mont. 2010); *see also Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 770 (9th Cir. 1985).

I.   THE WATER QUALITY STANDARDS APPROVED BY EPA FAIL TO CONFORM TO THE REQUIREMENTS OF THE CLEAN WATER ACT.

The Clean Water Act does not allow cost considerations to drive water quality standards, either directly or indirectly, through "variances" that downgrade

water protection for 20 years or more.  In approving Amended Circular 12-B, EPA failed to heed the plain language of the Clean Water Act that requires water quality standards to protect designated uses of waterbodies.  Waterkeeper's arguments center on two points: (1) Amended Circular 12-B continues to displace the science-based nutrient water quality standards in Circular 12-A and establishes the effective water quality standard for Western Montana and the Yellowstone River; and (2) costs were the driver for the original and Amended Circular 12-B and the Clean Water Act, 33 U.S.C. § 1313, does not allow for water quality standards to be based on cost considerations.

A.   The Clean Water Act Requires Water Quality Standards To Include Science-Based Criteria Necessary To Protect Designated Uses Of Montana's Waters.

In the Federal Water Pollution Control Act of 1972, commonly referred to as the Clean Water Act, Congress stated the Act's purpose and goals to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" and that wherever attainable, the *interim goal* of attaining water quality sufficient to provide for the protection and propagation of fish, shellfish, and wildlife, as well as recreation in and on the water by *July 1, 1983*.  33 U.S.C. § 1251(a) and (a)(2). Congress further set the national goal that all discharges of pollution to navigable waters would be *eliminated by 1985*.  *Id*. § 1251(a)(1).

The Act directs states to develop water quality standards sufficient to meet

the requirements of the Act, and requires EPA to step in and develop standards where a state is unwilling or unable to do so.  *Id*. § 1313(a).  A state's proposed standards and subsequent modifications or additions thereto must be submitted to EPA for review and approval (or disapproval) to ensure compliance with the requirements of the Act.  *Id.* § 1313(a) and (b)(2).  Congress mandated that new and revised water quality standards:

> *shall* consist of the designated uses of the navigable waters involved and the water quality criteria for such waters based upon such uses. Such standards shall be such as to protect the public health or welfare, enhance the quality of water and serve the purposes of this chapter. Such standards shall be established taking into consideration their use and value for public water supplies, propagation of fish and wildlife, recreational purposes, and agricultural, industrial, and other purposes and also taking into consideration their use and value for navigation.

*Id.* § 1313(c)(2)(A) (emphasis added).  This language makes clear Congress' intent that water quality standards must protect designated uses of the nation's waters. Moreover, Congress directed that those protected designated uses must include public water supplies, fish and wildlife, and recreation.  *Id.* § 1314(a).  *See also, id.* § 1314(b).  The Act does not contemplate or allow for standards to be established based on cost or affordability for dischargers that may be subject to water quality-based discharge limits under the Act.

When Congress' intent is clear it is the duty of the court to enforce that intent.  *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 194 (1978).  There is no need to defer or look to agency guidance or rule.  *Chevron USA, Inc.,* 467 U.S. at 843-44;

-16-

*Valencia v. Lynch,* 811 F.3d 1211, 1214 (9th Cir. 2016).  When a statute's text and thereby Congress' intent is plain, agency guidance, rule, or interpretation will not be allowed to contradict or subvert Congressional text and intent.  *See Husted v. A. Philip Randolph Inst.,* 2018 WL 2767661, at *11 and *13-14 (Sup. Ct., June 11, 2018) (it is not the court's prerogative to second-guess Congress' considered judgement); *United States v. Maes*, 546 F.3d 1066, 1068 (9th Cir. 2008); *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1054 (9th Cir. 1994). The Fifth Circuit held more than thirty years ago that costs or affordability may play no role in the development of water quality criteria under 33 U.S.C. § 1313, finding Congress clear on that point.  *Miss. Comm'n on Natural Res. v. Costle,* 625 F.2d at 1277.[9]

    B.    <u>EPA's Approval of Amended Circular 12-B, A Water Quality Standard for Nutrient Pollution Based On What Is Considered Affordable Pollution Control, Violates The Plain Language Of The Clean Water Act</u>.

In approving the technology- and cost-based variance in original Circular

---

[9] The Supreme Court has held in the context of the Clean Air Act that courts will not infer that costs in setting protective environmental standards when Congress has not clearly directed the agency to do so. *Whitman v. American Trucking Ass'ns,* 531 U.S. 457 (2001).  Justice Scalia relied on the plain language of Clean Air Act directives for setting air standards to reject arguments that EPA must consider the cost of imposing a particular standard of air quality.  *American Trucking*, 531 U.S. at 465.  The Court points out that Congress plainly directed EPA to identify the maximum airborne concentration of a pollutant that the public health can tolerate, adding an adequate margin of safety and that "[n]owhere are the costs of achieving such a standard made part of that initial calculation."  *Id.* and at 466-67.  The Court's conclusion in *American Trucking* applies with equal force to § 303 of the Clean Water Act, 33 U.S.C. § 1313.

12-B and again in Amended Circular 12-B, EPA approved nutrient water quality standards for Montana that are based on cost or desired affordability of meeting the standards, are not science-based, do not protect designated uses, do not protect public health and welfare, and do not serve the purposes of the Clean Water Act.

In Circular 12-A, DEQ developed numeric nutrient criteria for phosphorus and nitrogen based on a record that supports the criteria in keeping with the requirements of the Act.  AR 1326 *et seq.*, AR 1346 *et seq.*, AR 1640.  DEQ's record and statements, as well as EPA's approval, demonstrate agreement that the numeric criteria in Circular 12-A reflect the level of pollution control necessary to protect Montana streams from the adverse effects of nutrient pollution, such as excessive algal growth, which can lead to the production of toxins, depletion of oxygen, and physical growth that interferes with recreation and fish habitat.  AR 241-249.  EPA's approval of the nutrient water quality standards in Circular 12-A is compliant with the Clean Water Act, 33 U.S.C. § 1313(c) and fully supported by the record.

Unfortunately, at the same time it approved Circular 12-A, EPA approved the original Circular 12-B variance standard, which is simply a technology- and cost-based performance standard for nutrient pollution treatment at waste facilities that effectively substitutes for the science-based numeric water quality standard in Circular 12-A.  Both the original and now the Amended Circular 12-B excuse

pollutant dischargers from requirements to meet the numeric water quality

standards if they comply with the less-stringent technological performance

requirements.  AR 1231 (Original Circular 12-B) and 20649-50 (Amended Circular

12-B).[10] This is contrary to the Clean Water Act.

Moreover, Amended Circular 12-B provides up to 17 years from 2017

before pollutant dischargers must even meet the less-stringent technology standard

(the variance).[11]  Amended Circular 12-B includes no plan, deadline, or even

discussion about whether or when the water quality-based nutrient criteria in

Circular 12-A must ever be met.  *See, e.g.,* AR 34321, 34822, and 37321.[12]

While Amended Circular 12-B will be subject to triennial review—as is

required by plain language in 33 U.S.C. § 1313—the under-protective technology

standard in Amended Circular 12-B will be made more protective only if water

treatment technology becomes "affordable" when considered in the aggregate

---

[10] Amended Circular 12-B does require that if a pollutant discharger is doing a
better job at removing nutrient pollutants than the 12-B "variance" standard, then
DEQ will hold the discharger to whatever level of performance it is currently
achieving.  AR 20650.  This is, of course, no less than is required by the "anti-
backsliding" provisions of the Clean Water Act, 33 U.S.C. § 1342(o).

[11] From 2014 through 2017, the even less-protective original Circular 12-B
variance applied.

[12] Counting from 2000 when EPA directed states to develop and implement
nutrient water quality standards, 65 Fed. Reg. 47167 (July 27, 2000) and AR 228 *et
seq.*, it will be 34 years before even the under-protective Amended Circular 12-B
standard is fully implemented, with no information on when DEQ and EPA will
actually require the Circular12-A science-based standards to apply.

across all dischargers.  AR 34522-23.  DEQ appears to consider this unlikely to

happen "unless the tax bases change or the demographics change." *Id*.[13]

EPA appears to justify approving the Amended Circular 12-B cost-based

variance standard in place of the Circular 12-A water quality-based numeric

standard, due entirely to general economic considerations, complaints, and

concerns about affordability of complying with the numeric criteria.  Over the

course of years DEQ worked with one hand to develop protective science-based

nutrient criteria, and with the other hand to justify a general variance in order to

prevent the numeric nutrient standard from taking effect. AR 11121 (DEQ email to

EPA that DEQ is considering variances "as a companion implementation

procedure option for the standards"), AR 11829, AR 1547 *et seq.*, AR 1589 *et

seq.*[14]  Over and over, the excuse or rationale given for negating the water quality-

---

[13] The assurances regarding triennial review are further dubious because the record (and common sense) indicate that DEQ is unlikely to suddenly require a change in a discharger's course of action once a discharger has started down the Amended Circular 12-B path and schedule. Dischargers themselves, in workgroup meetings for Amended Circular 12-B, raised the fact that changes at a discharging facility involve "20, 30, 40 year investments." AR 34529.

[14] DEQ's nutrient rules originally provided that the Circular 12-A numeric standard would be "void" if either EPA or a court disapproved of the Circular 12-B cost-based variance standard allowing pollutant dischargers—both public and private— to be excused from meeting water quality based standards in favor of cost-based technological standards.  ARM § 17.30.619(2).  The state statute underpinning this concept is still in effect.  MCA § 75-5-313.  *See also*, DEQ Brief in Opposition to Summary Judgment, 2017 at 21, n.5.

based criteria in this fashion had been cost or affordability.  AR 1219, 1239, 851 (original Circular 12-B) and AR 34805, 34808, 34521-23, 34430, 20734, 20738, 20651, 20648-49, 20381 (Amended Circular 12-B).  Those cost and affordability drivers did not change with Amended Circular 12-B.  *Id.*  Even worse, Amended Circular 12-B now provides *a 17-year timeline just to get to the weaker technology standard, or "variance"*, with no provision for meeting the Circular 12-A criteria that will actually protect designated uses.  AR 20651-52, 34822, 37321.

In *Miccosukee Tribe of Indians of Florida v. United States*, No. 04-21448-CIV, 2008 WL 2967654 (S.D. Fla. July 29, 2008), the Southern District of Florida addressed issues very similar to those in this case, and found that weakening water quality standards through the use of extensive variances was an improper end-run around the basic Clean Water Act requirements for water quality standards.[15]  In recognition of the need to protect the Everglades, Florida adopted a phosphorus rule that included a science-based numeric nutrient criteria for phosphorus and was protective of the designated uses.  *Id*. at \*27.  The phosphorus rule, however, also provided for permits to allow a higher level of pollutant discharge than would be dictated by the numeric nutrient criteria, because Florida argued it was not ready

---

[15] *Miccosukee Tribe of Indians of Florida v. United States* is prolonged litigation that has resulted in multiple opinions.  The opinions cited here are the initial Order Granting Summary Judgment (No. 04-21448-CIV, 2008 WL 2967654 (S.D. Fla. July 29, 2008)), and a later Order Granting Plaintiff's Motion to Compel to Comply with Summary Judgment Order (706 F. Supp. 2d 1296 (S.D. Fla. 2010)).

and dischargers were not willing to meet the science-based criteria that would protect the designated uses of the Everglades. *Id.* As here, EPA approved both the science-based numeric limit in the phosphorus rule and the amendments that excused meeting the standards, thereby effectively granting a blanket variance and delay very similar to this case. *Id.* at \*26, 28-29.

The court found EPA's approval of Florida's actions arbitrary and capricious; that the totality of Florida's actions creating the blanket variance "effectively suspends the enforcement of the narrative and default [numeric] phosphorus criterion and, in lieu, *creates new or revised water quality criterion*[.]" *Id.* at \*15 (emphasis added). The court found that the broad exceptions allowing dischargers to only comply with less protective technological limits rather than the more protective water quality-based criteria had the effect of amending the water quality-based standards themselves. *Id.* At \*12. "The 'effect' therefore, is to replace the narrative and numeric phosphorus criterion with an escape clause that allows non-compliance, by virtue of both an extended compliance date, and, during the extension, a **lesser** state water quality standard of compliance[.]" *Id*. at \*20 (emphasis in original). The court reiterated its findings in a second decision on a motion to compel compliance with the court's earlier order:

> "I directly stated that the State of Florida's reliance on moderating
> provisions and an extended 2016 compliance schedule, without first
> performing a 'use attainability analysis,' was a blanket variance and
> contrary to the Clean Water Act. I told the EPA '[its] conclusions are

-22-

not in accordance with law because *the CWA does not allow State water quality standards to be replaced with 'across-the-board' technology based effluent limitations, regardless of results, with an open-ended compliance schedule.*'"

*Miccosukee Tribe of Indians of Florida v. United States*, 706 F. Supp. 2d 1296, 1303-4 (S.D. Fla. 2010) (emphasis added).

With EPA's approval of both the original and Amended Circular 12-B, DEQ has accomplished the same unlawful result as the state of Florida: it created an off-ramp that allowed for less protective water quality standards, contrary to the Clean Water Act. *See* AR 11606 ("Because DEQ expected temporary implementation of the standards to be difficult, it convened a committee of stakeholders to advise it on criteria for a temporary variance *or off-ramp from the standards based on affordability*.") (emphasis added). The record reflects that costs were a primary factor in the development and approval of Circular 12-B and remain so with Amended Circular 12-B. *See* AR 11610, AR 13548, AR 13453, AR 13024 (emails between DEQ and EPA attempting to "back in" to financial conclusions in the economic evaluation process to justify the variance) and AR 34521-23, 20734, 20738, 20651, 20648-49. DEQ, like Florida, feared that actually meeting water quality standards would be difficult and attempted to find a way to avoid meeting them. The court in *Miccosukee* described Florida's actions as an "escape clause" that allowed dischargers to not meet the water quality standards. *Id*. at *20. Here, we have a self-described "off-ramp" or escape clause that achieves the same effect:

-23-

a wholesale change to Montana's water quality standards in Circular 12-A that does not purport to protect designated uses.

Through Amended Circular 12-B, EPA approved an economic off-ramp for dischargers to avoid meeting the requirements of the Clean Water Act indefinitely. Cost or affordability of achieving water quality standards protective of designated uses is not an allowable consideration in setting those standards under the plain direction of the Clean Water Act.  By approving a technological cost-based standard in place of the science and water quality-based numeric water quality criteria, on the basis of cost arguments, EPA has acted contrary to the requirements of the law and contrary to the evidence in the record before EPA.  EPA's approval of Amended Circular 12-B should be set aside.

> C.     EPA Cannot Subvert The Requirements Of The Clean Water Act Through Application Of A Rule.

EPA cannot circumvent the statutory requirements for water quality standards by simply characterizing the under-protective cost-based standard of Amended Circular 12-B as a variance under EPA's rules.  At the time DEQ issued original Circular 12-B, EPA did not have a rule expressly addressing whether or how to allow variances from applicable water quality standards.  EPA guidance at the time provided that it applied factors from use attainability analyses under 40 C.F.R. § 131.10(g) to allow variances.  EPA Water Quality Standards Handbook, Ch. 5, section 5.3.  *See* AR 824-825.  Since then, a few months after approving

original Circular 12-B, EPA finalized 40 C.F.R. § 131.14 allowing for variances

under particular circumstances similar to its earlier guidance.  DEQ and EPA

ostensibly developed Amended Circular 12-B under EPA's new variance rule.  *See*

AR 20376.  But what DEQ proposed and EPA approved here was a standard for

Montana waters that does not comply with § 1313 of the Clean Water Act because

it is much less protective than what the agencies determined, under Circular 12-A,

is necessary to protect Montana's designated uses.  EPA cannot interpret and apply

a rule in a manner that runs directly counter to requirements of statute, yet that is

what it has done in approving Amended Circular 12-B under its new variance rule.

An agency cannot circumvent or subvert the plain direction of Congress

through rule, either explicitly or in the manner the agency interprets and applies its

rule.  *United States v. Maes*, 546 F.3d 1066, 1068 (9th Cir. 2008) (a regulation

does not trump an otherwise applicable statute); *United States v. Doe*, 701 F.2d

819, 823 (9th Cir. 1983) (when a regulation conflicts with a statute, the statute

controls).  Waterkeeper is not challenging EPA's variance rule on its face.  It does

not matter what the rule provides on its face if EPA's action interpreting and

applying the rule violates the specific direction of the statute.  As the court found

in the *Miccosukee* case, the agency cannot use a long-term general "variance" to

substitute for actual protective water quality standards whether EPA does so under

guidance (as was the case in *Miccosukee* or with Original Circular 12-B) or under a

rule (as with Amended Circular 12-B). The result is the same and that result violates the Clean Water Act.

Waterkeeper challenges EPA's interpretation and application of its rule allowing Amended Circular 12-B to substitute for the science-based Circular 12-A nutrient water quality standards as wholesale contrary to the plain language and directives of the Clean Water Act. As set forth above, EPA's approval of the original and Amended Circulars 12-B set a water quality standard based on costs and technologies that are deemed "affordable," not on what is scientifically required for protection of designated uses. As further set forth above, allowing water quality standards to be driven by costs and "affordability" is contrary to the specific direction in 33 U.S.C. § 1313(c). EPA cannot now interpret and apply its variance rule to excuse its approval of a water quality standard for Montana waters that is not protective of designated uses, does not protect public health and ecosystems, and simply claim that it has a rule that allows variances.

II.   EPA CANNOT DOWNGRADE DESIGNATED USES IN ORDER TO WEAKEN WATER QUALITY STANDARDS FOR COST REASONS.

EPA and DEQ promulgated and approved Circular 12-B and then Amended 12-B, both of which are less protective of Montana waters than the science-based criteria in Circular 12-A. AR 849-50; AR 20380-81, 20383-84, 20410-12; and ECF 98, generally and at 37-39. EPA has previously claimed that despite the fact that Congress did not authorize states to consider costs in establishing water

quality standards, *see* 33 U.S.C. § 1313(c), states can consider costs in setting or downgrading the "designated use" of waters.  EPA Opp. ECF Dkt. No. 77, at 36 and 40.  This is a distinction without much of a difference as the end result is still a cost-driven water quality standard, applicable for at least 20 years.

Specifically, EPA has argued that it may approve a water quality standard that does not protect the applicable designated uses of the relevant water body, because EPA rules purport to allow states to downgrade designated uses based on the concept of "attainability," which involves consideration of costs and other factors unrelated to water quality. EPA Opp. at Section I.A, ECF Dkt. No. 77. EPA's argument on this point ignores the plain language of 33 U.S.C. § 1313(c) regarding designated uses that are to be protected, and further ignores the designated uses that must be protected under Montana's regulations.

Section 1313(c)(2)(A) directs that water quality standards must be developed to protect designated uses including public water supplies, propagation of fish and wildlife, and recreation.  The statute does not say the listed uses should be protected "to the extent states deem appropriate, taking into account costs," nor does it say "if possible, considering economics," and it does not say "where attainable" or "where practicable."  Congress authorized EPA to approve states' water quality standards only if they are sufficient to protect the water *for those uses specified in the text of the Clean Water Act.*  33 U.S.C. § 1313(c).

-27-

Further, designated uses of Montana's waterbodies are not ambiguous and not in question in this case. DEQ long ago adopted designated uses that provide for "fishable and swimmable" water quality, including the protection of public water supplies and aquatic life in Montana waters, § 17.30.601, ARM, and those uses remain in place. Montana's designated uses are presumptively attainable under the Clean Water Act. *Idaho Mining Ass'n, Inc. v. Browner*, 90 F. Supp. 2d 1078, 1081 and 1107 (D. Idaho 2000) (rejecting a challenge to EPA's presumption of attainability for fishable and swimmable use designations, and finding that the presumption furthers the goals and purposes of the Clean Water Act). Those are the uses that must be protected and Amended Circular 12-B does not do so.

Nor does EPA gain cover for its actions by claiming that designated uses need to be protected by water quality standards only "where attainable." EPA Opp. at Sec. 1.A. As noted above, the concept of attainability is nowhere present in 33 U.S.C. § 1313(c). Rather, the Act directs that standards protect designated uses, period. EPA does not explain where it finds Clean Water Act authority for the "attainability" concept that would allow the extensive blanket variances it approved in this case.

The only place the word "attainable" appears in the Clean Water Act is 33 U.S.C. § 1251, the general aspirational and interim goals of the Act. In that section, Congress states the purpose of the Act is "to restore and maintain the

chemical, physical, and biological integrity of the Nation's waters[.]" *Id.* at §

1251(a).  The section further provides that en route to *eliminating* the discharge of

pollutants entirely by 1985, it is an interim national goal that by July 1, 1983, water

quality be sufficient to provide for the protection and propagation of fish, shellfish,

and wildlife, as well as recreation, where attainable.  *Id.* at § 1251(a)(1) and (2).

Even reading this as charitably as possible relative to EPA's arguments, the interim

goal language must still be read in the context of Congress' more specific direction

in 33 U.S.C. § 1313.  Section 1313 is the controlling provision of the Clean Water

Act here, under which DEQ and EPA developed and approved the standards in

question.  Section 1313 requires that water quality standards "shall consist of the

designated uses of the navigable waters involved and the water quality criteria for

such waters *based on such uses*." *Id.* (emphasis added).  Montana has adopted

designated uses including human contact recreation and protection of aquatic life

sufficient to support wildlife and fishing. § 17.30.601, ARM.

 Taken to its logical conclusion, EPA's position would allow costs to become

the determinative factor in the development of water quality standards—not

science, not public health, and not what is needed to protect aquatic resources.

This practice would negate the purpose of the water quality standards requirements

in 33 U.S.C. § 1313(c) and Congress' specific direction to protect human contact,

fishing and wildlife.  Downgrading a designated use for 20 years or more is not a path to compliance with the Clean Water Act and is not what the Act envisioned.

CONCLUSION

EPA's approval of DEQ's Amended Circular 12-B technology performance standard for nutrient pollutants is contrary to the direction of Congress in the Clean Water Act in that it is not a water quality standard designed to protect designated uses and to serve the purposes of the Clean Water Act.  Moreover, Amended Circular 12-B is wholly contrary to the record that the supports science-based nutrient criteria established in Circular 12-A.  Waterkeeper respectfully requests that the Court reverse and vacate EPA's approval of Amended Circular 12-B.

Respectfully submitted this 29th day of June, 2018.

/s/ Janette K. Brimmer
JANETTE K. BRIMMER (WSB #41271)
STEPHANIE K. TSOSIE (WSB #49840)
(*Pro Hac Vice Admission*)
Earthjustice
705 Second Avenue, Suite 203
Seattle, WA  98104-1711
(206) 343-7340 | Phone
(206) 343-1526 | Fax
jbrimmer@earthjustice.org
stsosie@earthjustice.org

*/s/ Katherine O'Brien\**
*Per email authorization*
KATHERINE O'BRIEN (MSB #13587)
Earthjustice
313 East Main Street
Bozeman, MT  59715-6242
(406) 586-9699 | Phone
(406)586-9695 | Fax
kobrien@earthjustice.org
*Local Counsel for Plaintiff Upper Missouri*
*Waterkeeper*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(d)(2), I hereby certify that the foregoing brief contains 7,424 words, as determined by the word count function of Microsoft Word.  The Court has granted leave to file a brief in excess of the Court's 12000 words limit (ECF No. 143).

DATED this 29th day of June, 2018.

*/s/Janette K. Brimmer*
JANETTE K. BRIMMER

## CERTIFICATE OF SERVICE

I hereby certify that on June 29, 2018, I electronically filed the foregoing

*Memorandum In Support of Plaintiff's Second Motion for Summary Judgment* with

the Clerk of the Court using the CM/ECF system, which will send notification of

this filing to the attorneys of record and all registered participants.

DATED this 29th day of June, 2018.


/s/Janette K. Brimmer
JANETTE K. BRIMMER