**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION**

| | |
|---|---|
| UPPER MISSOURI WATERKEEPER, | CV-16-52-GF-BMM |
| Plaintiff, | |
| vs. | **ORDER** |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and SCOTT PRUITT, Administrator, United States Environmental Protection Agency, | |
| Defendants, | |
| and | |
| STATE OF MONTANA DEPARTMENT OF ENVIRONMENTAL QUALITY, TREASURE STATE RESOURCES ASSOCIATION OF MONTANA, MONTANA LEAGUE OF CITIES AND TOWNS, and NATIONAL ASSOCIATION OF CLEAN WATER AGENCIES | |
| Defendants and Intervenors. | |

Plaintiff Upper Missouri Waterkeeper ("Waterkeeper") moves for summary judgment in its First Amended Complaint. (Doc. 148.) Waterkeeper asserts two causes of action. Waterkeeper first alleges that EPA's approval of Montana's numeric nutrient criteria for nitrogen and phosphorous, contained in the variance, violates 33 U.S.C. § 1313. (Doc. 130 at 17-18.) Waterkeeper next contends that EPA's approval of the variance proves both contrary to the evidence and arbitrary and capricious. *Id.* at 18-19. Waterkeeper requests that the Court vacate EPA's approval of the variance and award costs and attorney's fees. *Id.* at 20.

Defendants United States Environmental Protection Agency ("EPA") and Scott Pruitt, EPA Administrator, and Defendant-Intervenors State of Montana Department of Environmental Quality ("DEQ"), Treasure State Resources Association of Montana, Montana League of Cities and Towns, and National Association of Clean Water Agencies (collectively "Defendants"), also have moved for summary judgment to uphold the approval. (Docs. 151, 155, 159, 161, 165.) The Court held a hearing on the cross-motions for summary judgment on December 12, 2018, in Great Falls, Montana.

## BACKGROUND

DEQ adopted, and EPA approved, base numeric nutrient water quality standards ("WQS") for nutrient pollutants in 2015. DEQ set forth Montana's original WQS in what DEQ defined as "Circular 12-A" (hereafter "Montana's Base

WQS"). Montana's Base WQS apply to the discharge of nitrogen and phosphorus in applicable Montana waters. DEQ developed standards for each of Montana's "wadeable streams" and grouped these standards by ecoregions. AR-1221. Montana's Base WQS serve to protect all designated uses, including health, fishing, and recreation in most Montana waters.

Montana's Base WQS sets pollutant concentration limits, geographical parameters, and seasonal timeframes to which the standards apply. AR-1222-23. The criteria primarily apply from July until the end of September of each year. *Id.* Numeric standards in Montana's Base WQS for phosphorus that apply to Montana's wadeable streams range from 25 micrograms per liter ("µg/l") to 150 µg/l. *Id.* Total nitrogen levels range from 250 µg/l to 1,300 µg/l. *Id.* Montana became a national leader in the development of numeric nutrient criteria in adopting the stringent requirements of Montana's Base WQS.

DEQ simultaneously adopted a "variance" from Montana's Base WQS known as "Circular 12-B" (hereafter the "Original Variance Standard"). DEQ developed the Original Variance Standard in recognition of the challenges in meeting the stringent requirements of Montana's Base WQS. DEQ relaxed the criteria for dischargers. The Original Variance Standard provided a relaxed limit of 1,000 µg/l of total phosphorus and 10,000 µg/l of total nitrogen for larger plants discharging more than one million gallons of effluent per day ("gpd"). AR-12232.

The Original Variance Standard additionally placed a limit of 2,000 µg/l of total phosphorus and 15,000 µg/l of total nitrogen for smaller plants discharging less than one million gpd. *Id.*

DEQ developed the Original Variance Standard based on DEQ's determination that many dischargers could not feasibly meet the high costs associated with implementation of Montana's Base WQS. DEQ allowed the Original Variance Standard to last up to twenty years from the date of adoption pursuant to Montana law. DEQ claims that the Original Variance Standard allowed time for improvements from current conditions to work toward the stringent numeric nutrient criteria contained in Montana's Base WQS. EPA approved Montana's Base WQS and the Original Variance Standard in 2015.

Waterkeeper challenged the Original Variance Standard in this Court in May 2016. Montana law requires DEQ and EPA to review the variance every three years. Mont. Code Ann. § 75-5-313(8). DEQ began the process of amending the Original Variance Standard during the pendency of the May 2016 lawsuit. EPA approved what is known as "Amended Circular 12-B" (hereafter the "Current Variance Standard") in October of 2017, pursuant to its first triennial review.

EPA similarly approved the seventeen-year period remaining on the variance's twenty-year timeline. The first triennial review did not alter the criteria in Montana's Base WQS. AR-20649. The Current Variance Standard improves

upon the Original Variance Standard by providing a tighter limit of 300 µg/l of total phosphorus and 6,000 µg/l of total nitrogen for larger plants discharging more than one million gpd. AR-12232. The Current Variance Standard additionally placed a limit of 1,000 µg/l of total phosphorus and 10,000 µg/l of total nitrogen for smaller plants discharging less than one million gpd. *Id.* The Current Variance Standard places stronger limits on dischargers than the limits of the Original Variance Standard. The Current Variance Standard continues to fall short, however, of the criteria contained in Montana's Base WQS.

The Court held a hearing to discuss the impact of the Current Variance Standard on Waterkeeper's original Complaint on June 28, 2017. (Doc. 99.) The parties determined that the Current Variance Standard rendered the Original Variance Standard inapplicable to the proceeding. The Court granted Waterkeeper leave to amend its Complaint to address the Current Variance Standard and the updated posture that it presented to the litigation. (Doc. 129.)

The Current Variance Standard applies to thirty-six municipal dischargers. DEQ premised the Current Variance Standard upon "widespread economic and social impact" to Montana communities associated with the need to comply with the WQS. DEQ and EPA determined that the cost of implementing the technology required to meet Montana's Base WQS would cause these widespread economic and social impacts.

Waterkeeper's Amended Complaint raises the same essential challenges to EPA's approval of the Current Variance Standard. Waterkeeper alleges (1) that the language of the CWA does not allow for the consideration of economic and social impacts (i.e. "costs") in setting WQS; and (2) that the Current Variance Standard effectively replaces Montana's Base WQS. Waterkeeper argues that the seventeen-year timeline requires Defendants to meet only the more relaxed Current Variance Standard, rather than to meet the more stringent criteria in Montana's Base WQS. Defendants assert that DEQ based the Current Variance Standard upon a permissible interpretation of the CWA and that the Current Variance Standard does not replace Montana's Base WQS.

## STATUTORY AND REGULATORY BACKGROUND

### I.    WATER QUALITY STANDARDS

The CWA seeks "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The CWA establishes a partnership between states, territories, authorized Tribes, and the federal government to achieve that goal. *Arkansas v. Oklahoma*, 503 U.S. 91, 101 (1992). One "national goal" to meet the CWA's objectives is that "wherever attainable, an interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water" be achieved. 33 U.S.C. § 1251(a)(2).

The CWA requires that WQS be established "to protect the public health or welfare, enhance the quality of water, and serve the purposes of [the CWA]." 33 U.S.C. § 1313(c)(2)(A). WQS generally consist of three elements: (1) a designated use for the water body at issue; (2) water quality criteria that express the concentrations or levels of pollutants that may be present in the water while still supporting the designated use; and (3) an anti-degradation policy. 33 U.S.C. 1313(c)(2); CWA § 303(d)(4)(B); 33 U.S.C. 1313(d)(4)(B); 40 C.F.R. § 131.3(i).

The CWA directs individual states to take responsibility for prevention, reduction, and elimination of pollution within their waterways. 33 U.S.C. § 1251(b). This duty carries the obligation to promulgate WQS consistent with the purposes and requirements of the CWA. The CWA mandates that states periodically adopt and revise WQS. 33 U.S.C. § 1313(c)(1). In adopting or revising WQS, states must consider the particular water body's "use and value for public water supplies, propagation of fish and wildlife, recreational purposes, and agricultural, industrial, and other purposes." 33 U.S.C. § 1313(c)(2)(A).

The CWA also directs EPA to review, and approve or disapprove, a state's proposed standards. *Id.* A state's proposed standards take effect upon EPA's approval. EPA must intervene if it disapproves proposed standards and a state fails to develop standards that meet the requirements of the CWA. 33 U.S.C. § 1313(c)(4).

## A. DESIGNATED USES

States identify designated uses of each waterbody. States establish designated uses based on those specified in 33 U.S.C. § 1251(a)(2). Section 1251(a)(2) identifies these designated uses as "fish, shellfish, and wildlife, and . . . recreation in and on the water." *Id.* States establish designated uses "taking into consideration their use and value for public water supplies, propagation of fish and wildlife, recreational purposes, and agricultural, industrial, and other purposes, and also taking into consideration their use and value for navigation." 33 U.S.C. § 1313(c)(2)(A). States may demonstrate unattainability through a "use attainability analysis" for the uses designated in 33 U.S.C. § 1251(a)(2).

## B. VARIANCES

The regulations define a variance as a "time-limited designated use and criterion for a specific pollutant(s) or water quality parameter(s) that reflect the 'highest attainable condition' during the term of the WQS variance." 40 C.F.R. § 131.3(o). A state seeking a variance must demonstrate the need and justification for the term of the variance. 40 C.F.R. § 131.14(b)(2). EPA's regulations provide several bases for demonstrating a need for a variance, including "widespread economic and social impacts." 40 C.F.R. §§ 131.14(b)(2); 131.10(g). Montana allows a variance to last for a period of up to twenty years from the date of adoption. Mont. Code Ann. § 75-5-313(8). Montana also requires that a variance

be reviewed every three years from the date of adoption to ensure that it remains justified. Mont. Code Ann.§ 75-5-313(7), (8).

## LEGAL STANDARDS

The Administrative Procedure Act ("APA") governs the Court's review of EPA's approval of the Current Variance Standard. The APA provides that a court shall set aside a final agency action that it deems "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency acts contrary to the law when it fails to abide by and implement the direction and intent of Congress or when it acts contrary to its own rules and requirements. *Chevron USA, Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984); *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 154 (2012).

An agency rule proves arbitrary and capricious in the following circumstances: (1) where the agency "has relied on factors which Congress has not intended it to consider;" (2) where the agency "entirely failed to consider an important aspect of the problem;" (3) where the agency "offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Ranchers Cattlemen Action Legal Fund United*

*Stockgrowers of Am. v. U.S. Dep't of Agriculture*, 415 F.3d 1078, 1093 (9th Cir. 2005).

Courts have interpreted the APA standard to be "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Bahr v. U.S. EPA*, 836 F.3d 1218, 1229 (9th Cir. 2016) (*quoting Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agriculture,* 499 F.3d 1108, 1115 (9th Cir. 2007)). An agency action will be upheld as long as a rational connection exists "between the facts found and the conclusions made." *Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1132 (9th Cir. 2011). Courts owe their "highest deference" to the agency's "technical analyses and judgments within its area of expertise." *Nat. Res. Def. Council, Inc. v. Pritzker*, 828 F.3d 1125, 1139 (9th Cir. 2016) (*quoting League of Wilderness Defs. Blue Mtns. Biodiversity Proj. v. Allen*, 615 F.3d 1122, 1131 (9th Cir. 2010)).

Courts "defer to an agency's interpretations of its own regulation, advanced in a legal brief, unless that interpretation is 'plainly erroneous or inconsistent with the regulation.'" *Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 208 (2011) (*quoting Auer v. Robbins*, 519 U.S.452, 461 (1997)). An agency's interpretation "need not be the only possible reading of a regulation – or even the best one – to prevail." *Decker v. NW. Envtl. Def. Ctr.*, 568 U.S. 597, 613 (2013).

Summary judgment would be appropriate if there exists no genuine issue of material fact and the moving party would be entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). This case involves review of final agency action and an administrative record. It presents no genuine issues of material facts, and, therefore, it would be appropriate to resolve the case on summary judgment. *Forest Serv. Emp's for Envtl. Ethics v. U.S. Forest Serv.*, 726 F. Supp. 2d 1195, 1207 (D. Mont. 2010); *see also Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 770 (9th Cir. 1985).

## DISCUSSION

### I. WHETHER THE CURRENT VARIANCE STANDARD CONFORMS WITH THE REQUIREMENTS OF THE CWA

Waterkeeper first argues that the use of a variance indirectly downgrades the numeric criteria in Montana's Base WQS by injecting the consideration of costs. (Doc. 150 at 20-21.) Waterkeeper asserts that CWA's plain language clearly requires the consideration only of "science-based criteria" to protect designated uses of Montana's waters. *Id.* at 21.

Congress mandated that new and revised WQS "shall consist of the designated uses of the navigable waters involved and the water quality criteria for such waters based upon such uses." 33 U.S.C. § 1313(c)(2)(A). States must set

these standards "to protect the public health or welfare, enhance the quality of water and serve the purposes of the CWA." *Id.* States must consider the water's use and its value "for public water supplies, propagation of fish and wildlife, recreational purposes, and agricultural, industrial, and other purposes and also taking into consideration their use and value for navigation." *Id.*

Waterkeeper asserts that the language of 33 U.S.C. § 1313(c)(2)(A) allows only for "science-based" criteria in setting WQS. (Doc. 150 at 21.) Waterkeeper argues, therefore, that the consideration of cost conflicts with the intent of Congress. *Id.* at 22. A case of clear Congressional intent limits the district court's duty to enforcing that intent. *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 194 (1978). No need exists to defer or look to agency guidance or rule in such cases. *Chevron,* 467 U.S. at 843-44.

The two-step approach set forth in *Chevron* governs EPA's interpretation of 33 U.S.C. § 1313(c)(2)(A). The first step requires a court to ask whether Congress has "directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842-45. A court must give effect to the intent of Congress where Congress unambiguously has expressed intent. *Id.* On the other hand, where the statute remains "silent or ambiguous with respect to the specific issue," a court must determine "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843.

Waterkeeper does not challenge on its face the EPA rule that allows variances. (Doc. 150 at 31.) Waterkeeper instead argues that EPA's interpretation and application of the variance rule violates the plain direction of 33 U.S.C. § 1313(c)(2)(A). Waterkeeper's argument requires the Court to consider first whether the variance rule violates the statute's plain language. The Court must decide this issue before it can determine whether the implementation and application of EPA's rule violates the CWA.

## A. WHETHER CONGRESSIONAL INTENT WAS CLEAR ON THE FACE OF THE CWA

Waterkeeper asserts that the "core issue" in this case involves whether the plain language of 33 U.S.C. § 1313(c)(2)(A), requires WQS to be "science-based." (Doc. 167 at 5.) Waterkeeper argues that WQS "must be designed to protect designated uses of the nation's waters, including public water supplies, fish and wildlife, and recreation." (Doc. 167 at 9, *quoting* 33 U.S.C. § 1313(c)(2)(A).) Waterkeeper ignores the remainder of the sentence. This section further provides that WQS also must be designed to protect designated uses that include " . . . agricultural, industrial, and *other purposes* and also taking into consideration their use and value for navigation." 33 U.S.C. § 1313(c)(2)(A) (emphasis added).

Waterkeeper's *Chevron* Step-1 argument regarding the statute's plain language fails to address the statute's full language. In fact, Waterkeeper fails to

address the entirety of the specific sentence on which they rely. Congress did not set forth a mandatory list of factors. Congress instead merely provided EPA with list of factors to consider in setting designated uses. The statute's language indicates that Congress did not give more weight to one factor or another.

*Idaho Mining Ass'n, Inc. v. Browner*, 90 F. Supp. 2d 1078 (D. Idaho 2000), addressed a similar *Chevron* argument. *Idaho Mining* involved a challenge to the promulgation of WQS for three water body segments in northern Idaho. *Id.* at 1080. EPA published WQS that established aquatic life uses after having required the State of Idaho to submit standards that provided protection for fishable/swimmable uses. *Id.* at 1084. EPA relied on a rebuttable presumption that fishable/swimmable uses would be attainable unless shown otherwise by a use attainability analysis. *Id.*

EPA also established a separate procedure by which an individual discharger could obtain a variance from WQS by demonstrating the unattainability of that water for aquatic life use due to "substantial and widespread economic and social impact." *Id.* at 1085. The variance applied only to the individual variance holder. The underlying aquatic life use remained otherwise in effect. *Id.* The district court in *Idaho Mining* faced the task of determining whether the plain language of 33 U.S.C. § 1313(c)(2)(A) was ambiguous.

Section 1313(c)(2)(A) did not identify the precise question of what must be considered. Congress did not assign specific weight to the various factors. *Idaho Mining*, 90 F. Supp. 2d at 1097. The district court concluded that the CWA "merely provides a list of competing factors/uses to be considered." *Id.*

Nothing in the language of 33 U.S.C. § 1313(c)(2)(A) demonstrates clearly Congress's intent that WQS be "science-based." The "science-based" requirement stems instead from an EPA regulation that directs states to adopt water quality criteria. The regulation provides that "[s]tates must adopt those water quality criteria that protect the designated use." 40 C.F.R. § 131.11. States must base such criteria "on sound scientific rationale and must contain sufficient parameters or constituents to protect the designated use." *Id.* This regulation represents EPA's interpretation of 33 U.S.C. §§ 1313(c)(2)(A) and 1251. Waterkeeper's singular focus on the "science-based" requirement highlights the statute's ambiguity.

The language of 33 U.S.C. § 1313(c)(2)(A) expressly leaves room for interpretation. Waterkeeper argues that the use of the word "shall" curtails EPA's discretion to interpret the statute. (Doc. 167 at 9-10.) The statute provides, however, that standards "shall be established taking into consideration their use and value for public water supplies, propagation of fish and wildlife, recreation purposes and agricultural, industrial, and *other purposes . . .*" 33 U.S.C. § 1313(c)(2)(A) (emphasis added). The statute also requires standards to "serve the

15

purposes of [the CWA]." *Id.* The CWA seeks to provide for the protection and propagation of fish, shellfish, wildlife, and recreation "wherever attainable[.]" 33 U.S.C. § 1251(a).

Courts premise "[d]eference under *Chevron* to an agency's construction of a statute that it administers . . . on the theory that a statute's ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps." *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000). Congress's use of the phrase "other purposes" as a mandated consideration constitutes an implicit delegation to EPA to fill in a gap. Congress's use of the phrase "wherever attainable" also leaves room for EPA to determine whether attainability proves feasible in setting protections for fish, shellfish, wildlife, and recreation. EPA did not act contrary to Congressional directives when it interpreted 33 U.S.C. § 1313(c)(2)(A) through its regulation.

### B. WHETHER THE VARIANCE RULE REPRESENTS A PERMISSIBLE INTERPRETATION OF THE STATUTE

The Court has determined that the language of 33 U.S.C. § 1313(c)(2)(A) contains ambiguity. The Court next must determine whether 40 C.F.R. § 131.14 constitutes a permissible interpretation of the statute. Waterkeeper argues that it challenges EPA's application of the regulation to the CWA rather than challenging the specific language of 40 C.F.R. § 131.14. This distinction requires the Court to

determine whether EPA's interpretation "serves the purposes of [the CWA]." 33 U.S.C. § 1313(c)(2)(A).

Waterkeeper argues that "it does not matter what the rule provides on its face if EPA's action interpreting and applying the rule violates the specific direction of the statute." (Doc. 150 at 31.) This *Chevron* Step-2 analysis requires the Court first to determine whether the variance rule represents a permissible interpretation of the CWA. If the variance rule proves permissible, the Court must analyze whether EPA properly applied its variance rule.

The United States Supreme Court recognized in *Chevron* that "[when] Congress has not directly addressed the precise question at issue . . . the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. Courts generally defer to the administering agency's interpretation. *Udall v. Tallman*, 380 U.S. 1, 16 (1965).

EPA suggests that its regulation aims to interpret the directive in 33 U.S.C. § 1313(c)(2)(A) that WQS take "into consideration their use and value" for beneficial uses. (Doc. 172 at 15.) EPA further contends that its regulation recognizes that WQS shall "serve the purposes of the CWA" in any circumstance "wherever attainable." *Id.* EPA argues that its regulations allow states to demonstrate the infeasibility of attaining a designated use. 40 C.F.R. § 131.10(g).

For example, a state may demonstrate that a designated use would not be attainable due to "substantial widespread economic and social impacts." 40 C.F.R. § 131.14(b)(2)(i).

EPA reasonably exercised discretion in its interpretation of 33 U.S.C. § 1313(c)(2)(A). EPA's interpretation comports with Congress's intent that WQS "protect the public health or welfare, enhance the quality of water and serve the purposes of [the CWA]." 33 U.S.C. § 1313(c)(2)(A). The CWA seeks "to restore and maintain the chemical, physical and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The CWA seeks to protect fish, shellfish, wildlife, and recreation "wherever attainable." 33 U.S.C. § 1251.

Congress's use of the phrase "wherever attainable" demonstrates Congress's recognition that achievement of fishable/swimmable uses could not always be guaranteed immediately. The variance rule addresses this contingency by providing a mechanism to allow states to make swift progress toward attaining a designated use that would not be attainable immediately. *See* 80 Fed. Reg. 51,020, 51,039 (Aug. 21, 2015). The EPA variance rule comports with Congress's intent.

### C. WHETHER EPA'S INTERPRETATION OF ITS OWN REGULATION PROVES REASONABLE

Waterkeeper argues that EPA's interpretation of 40 C.F.R. § 131.14 violates the specific direction of 33 U.S.C. § 1313(c)(2)(A). (Doc. 150 at 31.) Waterkeeper

contends that EPA impermissibly based its approval of the Current Variance Standard on "cost" rather than the requirements for protection of designated uses. *Id.* at 32. An agency's interpretation of its own regulation deserves substantial deference unless "plainly erroneous or inconsistent with the regulation." *Auer*, 519 U.S. at 461 (*citing Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 359 (1989)).

The variance rule allows states to "adopt WQS variances, as defined in § 131.3(o)[,]" that would allow a "time limited designated use and criterion for specific pollutant(s) or water quality parameter(s)[.]" 40 C.F.R. §§ 131.14, 131.3(o). A state must show that attaining the designated use would not be feasible due to one of the factors set forth in EPA's regulations when it seeks a variance. 40 C.F.R. § 131.14(b)(2)(i)(A)(1). In this regard, a state can consider whether a designated use and criteria would result in "substantial and widespread economic and social impact." 40 C.F.R. § 131.10(g)(6).

EPA's approval of the Current Variance Standard proves reasonable and deserves deference. EPA interpreted "substantial and widespread economic and social impact" to include "cost." Waterkeeper has failed to demonstrate that EPA's interpretation of its regulation to encompass costs proves "plainly erroneous." *See Auer*, 519 U.S. at 461. Waterkeeper also has failed to show that EPA's interpretation conflicts with EPA's own regulation. *Id.* EPA's interpretation of its

regulation to include consideration of cost fits squarely within "economic" and "social" impacts. EPA's interpretation of 40 C.F.R. § 13.14 to allow an evaluation of "costs" deserves deference.

## II.   WHETHER EPA PROPERLY APPROVED THE VARIANCE

The Court has determined that EPA's variance rule comports with the CWA's requirements. The Court next must evaluate whether DEQ and EPA set forth a proper variance.

### A. VARIANCE

The Current Variance Standard addresses a use set forth in Section 101(a)(2) of the CWA. This reliance on Section 101(a)(2) requires DEQ to demonstrate that it had met one of the factors required for a variance. DEQ determined that the Current Variance Standard proves necessary based on "substantial and widespread economic and social impact." 40 C.F.R. §§ 131.14(b)(2)(i)(A), 131.10(g)(6).

DEQ evaluated wastewater treatment technologies that remove nitrogen and phosphorus to determine which technology could meet the numeric nutrient criteria. AR-20387. DEQ determined that reverse osmosis represented the strongest technology available to meet the numeric nutrient criteria. AR-1559. DEQ evaluated the cost of implementing reverse osmosis. AR-3132.

DEQ determined that little economic impact would occur if the financial impact of implementing reverse osmosis on a median household in a community would be less than one percent of household income. DEQ determined that large economic impact would occur, however, if a median household in a community would be affected by two percent or more of household income. AR-20482. DEQ also put forth a second test that considered measures of poverty rate, low and moderate income rate, unemployment rate, median household income, and tax and fee burden. AR-1557, 1583-87. Waterkeeper does not contest the validity of DEQ's findings regarding financial impacts.

## B. WIDESPREAD ECONOMIC AND SOCIAL IMPACTS

DEQ next analyzed whether the expected impacts would be "widespread." DEQ's study determined that ninety-five percent of communities would be affected. DEQ determined that communities across the State of Montana would suffer widespread economic and social impacts if they immediately had to meet Montana's Base WQS. AR-20480. DEQ made the same determination in its previous triennial review in 2015. AR-1553.

EPA reviewed DEQ's variance submission. EPA agreed that reverse osmosis represents the only wastewater technology that could meet the numeric nutrient criteria. AR-20393. EPA determined that all communities within the State of

Montana met the "widespread economic and social impacts" standard that justified a variance. AR-20393. EPA approved the Current Variance Standard for thirty-six municipal dischargers. Waterkeeper does not challenge EPA's conclusion that Montana's Base WQS would cause widespread economic and social impacts to communities across the State of Montana.

### C. "HIGHEST ATTAINABLE CONDITION"

DEQ next evaluated the "highest attainable condition" during the term of the Current Variance Standard. The "highest attainable condition" serves as the criteria of the variance during the variance's term. 40 C.F.R. § 131.3(o). The Current Variance Standard established the "highest attainable condition" for dischargers using mechanical plants and lagoons. *See* 40 C.F.R. § 131.14(b)(1)(ii)(A).

The Current Variance Standard places a limit of 300 µg/l of total phosphorus and 6,000 µg/l of total nitrogen for larger plants discharging more than one million gpd. AR-20650. The Current Variance Standard further places a limit of 1,000 µg/l of total phosphorus and 10,000 µg/l of total nitrogen for smaller plants discharging less than one million gpd. *Id.* This "highest attainable condition" represents the relaxed criteria of the Current Variance Standard for the next seventeen years. AR-20651. EPA approved DEQ's determination of the "highest attainable condition." AR-20408, 20412-13. Waterkeeper does not challenge EPA's approval of the "highest attainable condition."

### D. TERM OF THE VARIANCE

EPA approved the maximum twenty-year variance period proposed by DEQ when it established the Original Variance Standard. AR-1231. DEQ subsequently conducted its first triennial review and established the relaxed criteria of the Current Variance Standard. DEQ determined that mechanical plants required as long as necessary to meet the Current Variance Standard. Seventeen years remained on the twenty-year timeline that began with the adoption of the Original Variance Standard. AR-20649.

DEQ set a limit of no longer than seventeen years from EPA's approval in 2017 to meet the Current Variance Standard. AR-20651. DEQ also will review the variance conditions every three years to assure that the justification for the variance's adoption remains valid. AR-20650-51. EPA approved DEQ's seventeen-year term for mechanical plants, and a related ten-year term for lagoons to meet the relaxed criteria of the Current Variance Standard. AR-20416, 20654-55.

DEQ next established a nine-step process for the thirty-six dischargers to achieve the relaxed criteria of the Current Variance Standard. AR-20651. DEQ identified each step as a threshold on the path to meet the relaxed criteria of the Current Variance Standard. DEQ estimated the approximate number of years that each step would take. AR-20652. The number of years associated with each of the

nine steps, not coincidentally, adds up to the seventeen years remaining on the Current Variance Standard as it appears that DEQ sought to take advantage of the full twenty years of the original variance period. *Id.*

Waterkeeper argues that Defendants have compounded the variance problem by allowing dischargers this seventeen-year period simply to reach the relaxed criteria of the Current Variance Standard. (Doc. 150 at 27.) Waterkeeper argues that DEQ has included no provision in the variance criteria that requires dischargers ever to meet Montana's Base WQS. *Id.* Defendants contend that a variance properly allows time in which a discharger can progress toward attainment. (Doc. 152 at 47.) The designated time would allow an opportunity to develop new technologies and assess changed conditions that may allow for a more stringent "highest attainable condition" in the future. AR-20650-51.

DEQ's and EPA's interpretation of the variance rule properly requires a case-by-case analysis of dischargers that qualify for the variance. A facility that discharges more than one million gpd must achieve a total nitrogen concentration level of 6,000 µg/l to reach the Current Variance Standard. AR-20498. An examination of the current system in practice, however, reveals a fundamental flaw.

The City of Bozeman, an operator of a larger facility, discharges more than one million gpd. AR-20427. The City of Bozeman currently discharges 4,400 μg/l of total nitrogen daily on average.[1] AR-20436. The City of Bozeman currently discharges a total nitrogen level that attains the relaxed criteria contained in the Current Variance Standard. DEQ may still determine, however, that the City of Bozeman qualifies for a variance because it needs time to work toward attainment of the stricter criteria in Montana's Base WQS. This scenario comports with the purpose of a variance to allow a discharger time to meet the actual standards of Montana's Base WQS.

Another example reveals the flaw. The City of Whitefish also currently discharges more than one million gallons per day. AR-20427. The City of Whitefish discharges 24,200 μg/l of total nitrogen daily on average. AR-20434. The City of Whitefish does not yet meet the Current Variance Standard of 6,000 μg/l. AR-20498. DEQ may determine, however, that current conditions at the City of Whitefish do not require it to meet even the relaxed criteria of the Current Variance Standard. *See* AR-20498. DEQ will analyze how far the City of Whitefish stands from meeting the relaxed criteria of the Current Variance Standard.

---

[1] The City of Bozeman's total nitrogen level is provided by an October 21, 2016, study regarding cost estimates for major and minor NPDES wastewater treatment plants in Montana. AR-20429. The study used the milligram per-liter measurement of mass. The Court has converted the measurements to micrograms for purposes of this Order. The mass in micrograms is equal to the mass in milligrams times 1,000.

DEQ could authorize anywhere between zero steps and the full nine steps for the City of Whitefish to reach the relaxed criteria of the Current Variance Standard. *See* AR-20498. The number of years that DEQ allows the City of Whitefish to reach the Current Variance Standard may run anywhere between zero and the full remaining seventeen years of the variance. The City of Whitefish still would fall below attainment of the stricter criteria in Montana's Base WQS at the end of the seventeen years. This scenario conflicts with the notion that a variance should allow a discharger sufficient time to reach the stricter criteria contained in Montana's Base WQS. *See* 80 Fed. Reg. at 51,035. The variance displaces Montana's Base WQS under this scenario.

The regulations define a variance as "a time-limited designated use and criterion for a specific pollutant(s) or water quality parameter(s) that reflect the 'highest attainable condition' during the term of the WQS variance." 40 C.F.R. § 131.3(o). The regulations further provide that the variance's term must be only "as long as necessary to achieve the highest attainable condition." 40 C.F.R. § 131.14(b)(1)(iv). These regulations prove contradictory.

The regulations initially contemplate that a discharger must begin with the highest possible condition that it can attain – the "highest attainable condition." *See* 40 C.F.R. § 131.3(o), (b)(1)(ii). EPA's "highest attainable condition"

contemplates the starting point from which a discharger works toward attainment of the ultimate designate use and criteria, in this case Montana's Base WQS.

The "highest attainable condition" regulation serves the purpose of the CWA. This regulation allows states to establish time-limited designated uses "to make progress toward [the underlying WQS]" *See* 80 Fed. Reg. at 51,037. The "highest attainable condition" regulation provides a "mechanism to make incremental progress toward . . . restoration and maintenance of the chemical, physical, and biological integrity of the Nation's waters." *Id.*

EPA's regulations contradict themselves and purposes of the CWA by establishing time to "achieve" merely the "highest attainable condition." *See* 40 C.F.R. § 131.3(o). The State of Montana allows a discharger up twenty years to achieve the "highest attainable condition." *See* Mont. Code Ann. § 75-5-313(8). The word "attainable" contemplates a condition that presently can be attained. To allow dischargers up to twenty years to achieve the "highest attainable condition" improperly inserts the word "potentially" and thereby renders meaningless the word "attainable." This interpretation further would establish a variance without any "time-limited" designation. *See id.* This interpretation would provide the public with no knowledge of how long a discharger may take to achieve Montana's Base WQS. EPA's regulation allowing time to "achieve" a variance stretches the definition of "highest attainable condition" to allow a twenty-year period merely to

reach the "highest attainable condition." This contradiction does not comport with the purposes of the CWA.

The variance should serve to allow a discharger to make progress toward attaining the highest condition – Montana's Base WQS. Nothing in EPA's regulations, or the terms of the variance that it approved, allows a discharger time to meet merely the relaxed criteria of the Current Variance Standard. Further, nothing in Montana's variance statute – the source of the twenty-year timeline – contemplates a timeline for the State of Montana to work toward compliance with the relaxed Current Variance Standard.

Defendants did not act arbitrarily and capriciously when they adopted the Current Variance Standard. Congress contemplated that attainment of a state's base WQS would not always be attainable immediately. The regulations effectuate this purpose by allowing dischargers time-limited variances to reach base criteria. Montana's Base WQS constitute the base criteria. Defendants acted arbitrarily and capriciously when they set forth a seventeen-year timeline after their first triennial review merely to meet the relaxed criteria of the Current Variance Standard. The CWA does not contemplate the ability of a state to adopt a variance from the variance.

The regulations do not prove arbitrary and capricious in their use of the phrase "highest attainable condition" as a representation of the treatment requirements throughout the term of the variance. *See* 40 C.F.R. § 131.14(b)(1)(ii). The regulations prove arbitrary and capricious, however, when they contradict the term "attainable" in setting forth the term of the variance as "only as long as necessary to *achieve* the highest attainable condition[.]" 40 C.F.R. § 131.14(b)(1)(iv) (emphasis added).

The seventeen-year timeline permissibly could be used to meet the criteria in Montana's Base WQS. Defendants must begin with a program that complies with the relaxed criteria of the Current Variance Standard. Defendants must work toward ultimate attainment of Montana's Base WQS in order to demonstrate progress toward attainment. Defendants must adopt a timeline for which attainment of Montana's Base WQS would be feasible. To hold otherwise would render meaningless Montana's Base WQS.

## II. WHETHER THE VARIANCE REPRESENTS A REPLACEMENT STANDARD

Waterkeeper argues that the Current Variance Standard constitutes a replacement WQS that does not protect the designated uses adopted by DEQ and EPA under Montana's Base WQS. Waterkeeper asserts that the Current Variance Standard now constitutes the State of Montana's Base WQS for the term of the

variance. Waterkeeper contends that EPA's approval of the Current Variance Standard proves arbitrary and capricious as it fails to protect designated uses.

Waterkeeper relies on *Miccosukee Tribe of Indians of Florida v. United States*, 2008 WL 2967654 (S.D. Fla. July 29, 2008), to argue that EPA used the Current Variance Standard to circumvent the requirements of Montana's Base WQS. The district court in *Miccosukee Tribe* analyzed the State of Florida's adoption of numeric nutrient criteria for phosphorus. *Id.* at *27. The State of Florida approved a blanket variance in light of its determination that dischargers were not yet ready to meet the criteria required to protect the designated use. The district court determined that EPA's approval of the blanket variance proved arbitrary and capricious. The blanket variance "effectively suspends the enforcement of the [numeric] phosphorus criterion and, in lieu, creates new or revised water quality criterion[.]" *Id.* at *15.

Waterkeeper argues that the district court's reasoning in *Miccosukee Tribe* compels a similar result for the Current Variance Standard. EPA's approval of the Current Variance Standard proves distinguishable at this time. The Current Variance Standard does not involve a blanket variance that covers all dischargers without requiring the discharger to request the variance. The Current Variance Standard also subjects dischargers to a use attainability analysis to demonstrate that a variance would be necessary to avoid substantial and widespread economic and

social impact. The Current Variance Standard does not involve dischargers who merely stand unwilling to meet the criteria for the designated use. *See Miccosukee Tribe*, at *27.

The Court has determined that Defendants must begin with compliance with the Current Variance Standard and then work toward attainment of Montana's Base WQS. The Current Variance Standard must involve a process by which DEQ evaluates attainability against the impact on median household income and socioeconomic conditions within communities. The district court in *Miccosukee Tribe* reasoned that the variance at issue did not contemplate progress toward attainment. The Court too recognizes that a variance's effect, even if not its intended purpose, may be to avoid attainment indefinitely rather than to make progress toward attainment.

EPA argues that the time-limited variance requires dischargers to take specific action to reduce pollutant discharges and make progress to achieving compliance with the underlying numeric nutrient criteria. Waterkeeper argues that the variance requires no such progress and merely acts as an "escape clause." To treat the Current Variance Standard as the baseline for the attainment of the criteria contained in Montana's Base WQS avoids allowing the variance to serve as an "escape clause." This treatment also distinguishes it, for now, from *Miccosukee Tribe*.

Montana set itself as a national leader in the development of numeric nutrient criteria to protect its precious water resources. The record fails to demonstrate that the Current Variance Standard represents an attempt to make progress toward attainment. Defendants must demonstrate progress toward attainment of Montana's Base WQS. Defendants must set forth a timeline that ends with the ultimate attainment of Montana's Base WQS rather than simply improving water quality to the level of the relaxed criteria of the Current Variance Standard.

The Court declines to allow the relaxed Current Variance Standard, similar to the variance at issue in *Miccosukee Tribe*, to replace the criteria of Montana's Base WQS. EPA's approval of the relaxed Current Variance Standard itself does not violate the CWA. EPA's approval of the current seventeen-year timeline to allow dischargers to meet the relaxed Current Variance Standards runs counter to the CWA's requirements and cannot stand.

## CONCLUSION

Defendants have demonstrated that 33 U.S.C. § 1313(c)(2)(A) contains ambiguity that EPA may interpret. EPA's variance rule that allows consideration of "widespread economic and social impacts" constitutes a permissible interpretation of 33 U.S.C. § 1313(c)(2)(A). EPA properly interpreted its regulation that allows

consideration of "widespread economic and social impacts" to allow the consideration of "cost." Defendants did not act arbitrarily and capriciously in their interpretation of the CWA and accompanying regulations.

Defendants' adoption of the Current Variance Standard comports with the evidence, and finds support in the record. Defendants' adoption of the Current Variance Standard was not arbitrary and capricious or an abuse of discretion. The Current Variance Standard does not currently constitute a replacement of Montana's Base WQS. Defendants' adoption of the Current Variance Standard does not violate the CWA.

EPA's regulations contemplate that the "highest attainable condition" could be attained now. EPA's regulations contradict themselves when they allow a discharger time to "achieve" the currently attainable condition. Defendants adoption of a seventeen-year timeline merely to reach the "highest attainable condition" violates the direction of the CWA. *See Chevron*, 467 U.S. at 842-43; *SmithKline*, 567 U.S. at 154. Defendants must set forth a timeline that leads to compliance with Montana's Base WQS.

The court recognizes the reality that dischargers throughout the State of Montana currently stand at different levels of attainment. The Court also recognizes that economic factors may constrain immediate compliance with the

Current Variance Standard for certain dischargers. The Court deems it appropriate under the circumstances to seek guidance from the parties as to the timing and scope of the appropriate remedies to address the issues identified in this Order. The Court directs counsel for all parties to confer in good faith to attempt to reach agreement as to potential remedies that include a timeline to achieve prompt compliance with the Current Variance Standard. If the parties cannot reach agreement, the Court directs the parties to submit additional briefing concerning remedies no later than sixty days from today's date.

This briefing shall consist of one brief for Waterkeeper not to exceed 7,500 words. DEQ shall be allowed one brief not to exceed 5,000 words. EPA shall be allowed one brief not to exceed 5,000 words. Intervenors shall be allowed collectively one brief not to exceed 2,500 words. The word limit shall include everything from the caption to the certificate of service. The agreed remedies, or the submitted briefs if the parties remain unable to agree on remedies, should include an expedited schedule for the EPA and DEQ to attempt to remedy the CWA deficiencies identified in this Order.

**ORDER**

(1)     Plaintiff's Motion for Summary Judgment (Doc. 148) is **GRANTED IN PART** and **DENIED IN PART**.

(2)     Defendants' Cross-Motions for Summary Judgment (Docs. 151, 155, 159, 161, & 165) are **GRANTED IN PART** and **DENIED IN PART**.

(3)     The parties shall meet and confer in good faith to attempt to reach an agreement as to remedies. If the parties cannot agree, the parties shall submit additional briefing on remedies no later than sixty days from today's date, in accordance with the above Order.

(4)     Entry of judgment will follow the imposition of a remedy in accordance with the above Order.

         DATED this 25th day of March, 2019.


Brian Morris
United States District Court Judge