# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MONTANA
# GREAT FALLS DIVISION

| | |
|---|---|
| UPPER MISSOURI WATERKEEPER,<br><br>        Plaintiff,<br><br>vs.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and ANDREW WHEELER, Administrator, United States Environmental Protection Agency,<br><br>        Defendants,<br><br>and<br><br>STATE OF MONTANA DEPARTMENT OF ENVIRONMENTAL QUALITY, TREASURE STATE RESOURCES ASSOCIATION OF MONTANA, MONTANA LEAGUE OF CITIES AND TOWNS, and NATIONAL ASSOCIATION OF CLEAN WATER AGENCIES<br><br>        Defendants and Intervenors. | CV-16-52-GF-BMM<br><br>**ORDER** |

Plaintiff Upper Missouri Waterkeeper ("Waterkeeper") filed an Amended Complaint alleging that Defendants United States Environmental Protection Agency and Andrew Wheeler, Administrator, United States Environmental

1

Protection Agency (collectively "EPA") had violated the Clean Water Act (CWA). The State of Montana Department of Environmental Quality, Treasure State Resources Association of Montana, Montana League of Cities and Towns, and National Association of Clean Water Agencies were named as Intervenor-Defendants. (*See id.*) All parties filed a motion or cross-motion for summary judgment. (*See* Doc. 148, 151, 155, 159, 161, 165.) The Court issued an order granting summary judgment, in part, in favor of Waterkeeper. (Doc. 177.) On order of the Court, all the parties filed briefing on the proper remedy. The Court issued an order on the remedy (Doc. 184) and then another order (Doc. 186) that directed the Clerk to enter Final Judgment in this matter.

EPA then filed a motion (Doc. 188) under Federal Rule of Civil Procedure 59 ("Rule 59") to alter or amend the Court's final judgment. They ask this Court to correct the "clear error" it made in granting partial summary judgment in favor of Waterkeeper.

**Legal Standard**

Rule 59 provides a court with discretion to alter or amend its own judgment. This discretion should be used sparingly. *Carroll v. Nakatani*, 342 F.3d 934, 945 (9th Cir. 2003). A court should disregard the interest in finality only in cases of newly discovered evidence or clear error. *Id.*

## Clean Water Act Framework

The Clean Water Act (CWA) establishes a partnership between states, territories, authorized tribes, and the federal government with the goal "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). As a means of accomplishing this goal, the CWA requires states to promulgate water quality standards (WQS) subject to federal approval. 33 U.S.C. § 1313 *et seq.* WQS generally consist of three elements: (1) a designated use for the water body at issue; (2) water quality criteria that express the concentrations or levels of pollutants that may be present in the water while still supporting the designated use; and (3) an anti-degradation policy. 33 U.S.C. 1313(c)(2); CWA § 303(d)(4)(B); 33 U.S.C. § 1313(d)(4)(B); 40 C.F.R. § 131.3(i). These standards must "protect the public health or welfare, enhance the quality of water, or serve the purposes of [the CWA]." *Id.* In short, states need to explain what the water will be used for and how low the state will keep levels of pollutants to maintain that use.

States may obtain variances with the approval of the EPA that allow a permitee to pollute at levels above the WQS. The regulations define a variance as a "time-limited designated use and criterion for a specific pollutant(s) or water quality parameter(s) that reflect the 'highest attainable condition' during the term of the WQS variance." 40 C.F.R. § 131.3(o). A state seeking a variance must

3

demonstrate the need and justification for the term of the variance. 40 C.F.R. § 131.14(b)(2). EPA's regulations provide several bases for demonstrating a need for a variance, including "widespread economic and social impacts." 40 C.F.R. §§ 131.14(b)(2); 131.10(g). Montana allows a variance to last for a period of up to twenty years from the date of adoption. Mont. Code Ann. § 75-5-313(8). Montana also requires that a variance be reviewed every three years from the date of adoption to ensure that it remains justified. Mont. Code Ann.§ 75-5-313(7), (8).

## Background

The Court will give just a brief refresher here, having thoroughly covered the factual history in a previous order from this litigation. *See Upper Mo. Waterkeeper v. E.P.A.*, 377 F. Supp. 3d 1156, 1159-60 (D. Mont. 2019). Montana DEQ adopted, and EPA approved, base numeric nutrient WQS for nutrient pollutants. DEQ set forth Montana's original WQS in what DEQ defined as "Circular 12-A" (hereafter "Montana's Base WQS"). Montana's Base WQS apply to the discharge of nitrogen and phosphorus in applicable Montana waters. Montana's Base WQS serve to protect all designated uses, including health, fishing, and recreation in most Montana waters. Montana's Base WQS set a range of 25 micrograms per liter ("µg/l") to 150 µg/l of phosphorus that apply to Montana's wadeable streams. Total nitrogen levels range from 250 µg/l to 1,300 µg/l.

DEQ simultaneously adopted a "variance" from Montana's Base WQS known as "Circular 12-B" (hereafter the "Original Variance Standard"). This variance contained relaxed criteria for dischargers. DEQ claims that the Original Variance Standard allowed time for improvements from current conditions to work toward the stringent numeric nutrient criteria contained in Montana's Base WQS. EPA approved Montana's Base WQS and the Original Variance Standard in 2015.

Montana law requires DEQ and EPA to review the variance every three years. Mont. Code Ann. § 75-5-313(8). As a part of that review process, DEQ chose to amend the Original Variance Standard. EPA approved what is known as "Amended Circular 12-B" (hereafter the "Current Variance Standard") in October of 2017.

The Current Variance Standard provides a limit of 300 µg/l of total phosphorus and 6,000 µg/l of total nitrogen for larger plants discharging more than one million gpd. AR-12232. The Current Variance Standard additionally placed a limit of 1,000 µg/l of total phosphorus and 10,000 µg/l of total nitrogen for smaller plants discharging less than one million gpd. *Id.* These numbers are summarized in the table below.

|  | Phosphorous (µg/l) | | Nitrogen (µg/l) | |
|---|---|---|---|---|
| **Montana's Base WQS** | 25-150 | | 250-1,300 | |
| **Current Variance Standard** | > 1 million gpd | < 1 million gpd | > 1 million gpd | < 1 million gpd |
| | 300 | 1,000 | 6,000 | 10,000 |

The Current Variance Standard applies to thirty-six municipal dischargers. DEQ gave the dischargers seventeen years from the time of EPA's approval to meet the Current Variance Standard. AR-20651. DEQ established a nine-step process for the thirty-six dischargers to achieve the Current Variance Standard. *Id.* DEQ and EPA determined that the cost of implementing the technology required to meet Montana's Base WQS would cause these "widespread economic and social impact" to the affected communities.

Waterkeeper brought an Amended Complaint making a number of allegations. It then moved for summary judgment. (*See* Doc. 148.) EPA and Defendant-Intervenors made cross-motions for summary judgment. (*See* Docs. 151, 155, 159, 161, 165.)

## Summary Judgment Decision

This Court made a number of rulings in its order on all of the parties' motions or cross-motions for summary judgment. As relevant to EPA's Rule 59 motion, the Court noted that, under the Current Variance Standard, cities "would fall below attainment of the stricter criteria of Montana's Base WQS at the end of

the" variance. (Doc. 177 at 26.) In doing so, "[t]he variance displaces Montana's Base WQS." (*Id.*)

The Court came to this conclusion by analyzing two regulations that govern variances, 40 C.F.R. § 131.3(o) and 40 C.F.R. 131.14(b)(1)(iv). The Court determined that those regulations contradicted each other. Section 131.3(o) defines a variance as "a time-limited designated use and criterion for a specific pollutant(s) or water quality parameter(s) that reflect the 'highest attainable condition' during the term of the WQS variance." This regulation "contemplate[s] that a discharger must begin with the highest possible condition that it can attain – the "highest attainable condition." (Doc 177 at 26.) Section 131.14(b)(1)(iv) states, however, that a variance must be only "as long as necessary to achieve the highest attainable condition." Thus, while § 131.14(b)(1)(iv) states that the highest attainable condition is something "to achieve," § 131.3(o) states that it is already achievable. (*Id.* at 26-27.)

To resolve this discrepancy, the Court noted that § 131.3(o) allows states "to make progress toward [the underlying WQS]," not some other lesser standard. *See* 80 Fed. Reg. at 51037. Allowing a variance merely to attain the "highest attainable condition" renders meaningless the word "attainable" in that regulation. And, in effect, it "would establish a variance without any time-limited" designation. (Doc. 177 at 27.) The Court concluded that the best way to read the contradicting

7

regulations in combination would be to presume that the "highest attainable condition" means the "highest attainable condition" right now, not attainable at some future date. (*See id.* at 28.)

Having read the variance regulations in this way, the Court then relied on that reading to reject Waterkeeper's argument that the Current Variance Standard constitutes a replacement WQS that fails to protect the designated uses outlined in the current WQS. (*See id.* at 32.) The Court said that the Current Variance Standard did not constitute a replacement standard "at this time," *see id.* at 30, because any variance issued under the Court's reading of the contradicting regulations contemplates progress towards the Montana's Base WQS. (*Id.* at 31.) Thus, as long as the Court read the regulations in the way it had, any variance from Montana's Base WQS would not constitute a replacement standard. (*Id.* at 32.)

## Discussion

EPA suggests in its Rule 59 motion that the Court committed clear error. EPA contends that the Court misunderstood EPA's lawful regulation governing variances from WQS under the CWA. (Doc. 189 at 6.) It argues that this misunderstanding led the Court to reach determinations inconsistent with the "unambiguous language of EPA's regulation." (*Id.*) EPA now asks the Court to "correct its clear error" by altering or amending the judgment to deny in full Waterkeeper's motion for summary judgment. (Doc. 189 at 2.)

EPA argues first that the "highest attainable condition" in the regulations contemplates the water quality standard to be achieved by the end of the variance. (*Id.* at 11.) It quotes the regulation language that the term of the variance should be "expressed as an interval of time" that "must only be as long as necessary to *achieve the highest attainable use*." (*Id.* (emphasis in original).) It accuses the Court of reading this italicized text out of the regulation. (*Id.*) EPA further notes that the regulation's allowance of subsequent variances comports with the notion that the discharger need not attain the Base WQS by the end of the initial variance. (*Id.* at 8.)

EPA further argues that its statements in the record from the variance rulemaking support its interpretation of the highest attainable condition as contemplated by regulations. EPA points out that it expressly rejected the view of some commentators that the final regulation should include a "requirement that the original water quality standard must be attained by a certain date." (*Id.* at 8 (citing AR 20063).) EPA highlights its response that a variance serves "to allow progress toward meeting a designated use and criterion even if the time required to attain the underlying designated use and criterion is uncertain." (Doc. 189 at 9 (citing AR 20063 at 20077).) EPA further suggests that the administrative record supports its interpretation. EPA notes that documents in the administrative record demonstrated

9

the infeasibility of some dischargers to meet Base WQS "at any time during the term of the variance." (Doc. 189, at 9-10 (citing AR 20386).)

EPA's own statements seem to contradict their reading of these regulations. EPA provided guidance to Montana when DEQ sought approval of the original 12-B variance. EPA's guidance cited to another document that noted that the interim requirements contained in a variance "will need to reflect the highest attainable condition during the term of the variance." AR 593. EPA explained that this highest attainable condition may be expressed as "the highest attainable interim use and criterion or highest attainable effluent condition for a permittee(s) during the term of the variance." *Id.* EPA clarified that this purpose could be accomplished "by specifying in the variance a numeric value that reflects the highest water quality that a discharger could achieve . . . during the term of the variance." *Id.* This guidance seems to comport with the notion that a discharger should start the variance with the highest attainable condition and end the variance with compliance with the Base WQS.

EPA contends that the language in the regulation regarding the term of the variance supports its looser interpretation. This interpretation allows Montana's dischargers to use the remaining 17 years of the current variance period to achieve the highest attainable condition. And, according to EPA, once the term of that variance ends, those same dischargers would be entitled to another variance, that

still would not require the dischargers to reach Montana's Base WQS. (Doc. 89 at 8 (citing 40 C.F.R. § 131.14(b)(1(iv); 80 Fed. Reg. 51,020, 51,035-36 (Aug. 21, 2015)).)

EPA's reading of the variance regulation would require the Court to strike down the Current Variance Standard as a replacement standard. The Court declined to do so in its summary judgment order. (Doc. 177 at 29-32.) Specifically, it refused to apply the reasoning of *Miccosukee Tribe of Indians of Florida v. United States*, 2008 WL 2967654, (S.D. Fla. 2008). As the Court explained, the Court's reading of the variance regulations distinguished Montana's system "for now" from the situation in *Miccosukee Tribe*. (Doc. 177 at 31.)

The district court in *Miccosukee* considered whether Florida and the EPA had approved, in effect, a new water quality standard when the EPA approved an open-ended timeline for achieving a less stringent WQS than Florida's base WQS. Florida simultaneously adopted a based WQS and variance for phosphorous in the Everglades in 1994. The variance gave dischargers until 2006 to comply with that WQS. *See Miccosukee*, 2008 WL 2967654, at *10. Florida then passed another law that was a "mandate that the State of Florida" implement water quality standards that fell below the 1994 standard. *Id.* at *20. Under this new law, discharge "permits may issue even if" they allowed discharges greater than Florida's phosphorous WQS, and it gave dischargers until at least 2016 to do so. *See id.* The

11

new law resulted in Florida creating a "*de facto* suspension of enforcement and compliance with state water quality standards that [would] continue for an indeterminate period, a result that cannot be permitted under the CWA." *Id.* at *25.

The district court declared in a subsequent order that the CWA "does not allow State water quality standards to be replaced with 'across-the-board' technology based effluent limitations regardless of the result, with an open-ended compliance schedule." *Miccosukee Tribe of Indians of Florida v. United States*, 706 F. Supp. 2d 1296, 1303-04 (S.D. Fla. 2010). The district court in *Miccosukee* recognized that indefinite suspensions of the base WQS constitute a replacement of that WQS. *See id.*

EPA's reading of the variance regulations would allow it to suspend indefinitely the base WQS. EPA's reading of the regulations would allow dischargers to receive variances that do not require attainment of base WQS, to be followed by the same dischargers receiving more variances that still would not require attainment of base WQS. This scenario would constitute an in definite suspension of base WQS and collide head on with *Miccosukee*.

This Court's reading of the variance regulations better comports with the structure of the CWA. The CWA and its regulations set up a different process for setting a WQS and for obtaining a variance. These processes must remain distinct.

*Miccosukee* recognizes this requirement by striking down a state's attempt at setting a new WQS without going through the process to do so.

As related to the process for setting a WQS, the CWA sets up a reverse-engineering process that inextricably connects designated uses and WQS. States must choose a result—"designated uses"—and then determine a way to achieve that result—setting WQS. The WQS represents an acceptable level of pollution while still maintaining designated uses. Permit holders must then adhere to those pollution levels.

Montana has adopted designated uses of its navigable waterways that provide for "fishable and swimmable" water quality. ARM Sec. 17.30.601. These uses further protect public water supplies and aquatic life in Montana waters. *Id*. Montana then developed numeric nutrient WQS in Circular 12-A to protect the designated uses of its waters. AR 1220-1225 (12-A), 1326, 1346, and 1636.

Variances, on the other hand, stand as a practical recognition that implementing a WQS sometimes proves easier said than done. And so the EPA has promulgated regulations that allow permit holders to pollute temporarily at rates above those that would protect the designated uses. Put another way, any time a variance is granted, a state and EPA temporarily endanger the designated uses from the WQS.

EPA and DEQ admit that the highest attainable condition as used in the Original Variance Standard fails to protect Montana's designated uses. AR 20648-50. EPA and DEQ further acknowledge that the highest attainable condition contemplated by the Original Variance Standard temporarily weakens Montana's water quality standards. AR 20380-81. As seen in the table below, the Current Variance Standard allows pollution at levels many times higher than Montana's Base WQS. And it does so without any guarantee that the dischargers will comply with the Base WQS even after 17 years of being allowed to pollute at levels that endanger Montana's designated uses.

|  | Phosphorous (µg/l) | | Nitrogen (µg/l) | |
|---|---|---|---|---|
| **Montana's Base WQS** | 25-150 | | 250-1,300 | |
| **Current Variance Standard** | > 1 million gpd | < 1 million gpd | > 1 million gpd | < 1 million gpd |
|  | 300 | 1,000 | 6,000 | 10,000 |

EPA suggests this Court committed clear error by failing to read the regulations in a way that would allow for indefinite variances from Montana's Base WQS. Put another way, EPA would like this Court to read the regulations in a way that allows states and the EPA to endanger perpetually Montana's designated uses. That interpretation cannot stand under the CWA.

EPA claims that the variance regulation "does not authorize an indefinite variance; the variance must include a term that is supported by submitted

14

documentation." (Doc. 210 at 11 (citing 40 C.F.R. §§ 131.14(b)(1)(iv), 131.14(b)(2)(ii).) This argument fails because it does not answer the one question that EPA must address to avoid a *Miccosukee* problem: what happens once a variance ends if that variance does not require attainment of base WQS? Under the EPA's reading, the discharger simply gets another variance. This subsequent variance also might not require the discharger to comply with base WQS and could contain another twenty-year timeline like the Original Variance Standard.

The lengthy variance term here demonstrates another reason that counsels in favor of this Court's reading of the regulations. Parties cannot wait until the EPA grants multiple variances to bring a *Miccosukee* challenge. Parties would have to wait 20 years at minimum to bring a challenge under the EPA's reading of the regulations. This interpretation would facilitate two decades of pollution discharges at levels above those necessary to maintain Montana's designated uses. The Court instead opts to interpret the regulations in a way that avoids a *Miccosukee* problem similar to the scenario in Florida.

EPA also claims that the regulations allowing for subsequent variances prove that a permit holder need not obtain the base WQS by the end of the variance. (Doc. 189 at 8 (quoting 40 C.F.R. § 131.14(b)(1)(iv).) As the Court has discussed, however, the variance regulations stand as a practical recognition that implementation of WQS does not always work out as a straightforward endeavor.

15

Variances, as shown here, can have lengthy timelines. Unknown and unforeseen circumstances may arise during the variance timeline. Permit holders should not be punished when these unforeseen circumstances arise. The Court's interpretation of the regulations seeks to avoid these problems.

**ACCORDINGLY, IT IS HEREBY ORDERED** that EPA's motion to alter or amend the judgment (Doc. 188) is **DENIED.**

DATED this 20th day of December, 2019

_____
Brian Morris
United States District Court Judge